**Irving N. SIDMAN and Celia C. Sidman, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**No. 66 Civ. 1148.**

United States District Court, S. D. New York.

Nov. 9, 1971.

Morton M. Cohen, New York City, for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for defendant; Daniel H. Murphy, II, Asst. U. S. Atty., of counsel.

LASKER, District Judge.

Plaintiff moves for summary judgment on his complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking a refund of certain income taxes paid by him on income received by plaintiff Irving N. Sidman ("taxpayer") [1] for the years 1959 and 1960. Defendant argues in its answering memorandum that the complaint should be dismissed. There is no fac-

---

1. The taxpayer is Irving N. Sidman. Mrs. Sidman is joined because they filed a joint return.

tual dispute. The issue is whether payments received by Irving Sidman upon termination of his employment qualify for exclusion as sick pay under § 105 of the Internal Revenue Code of 1954. (26 U.S.C. § 105).

The record establishes the following facts: Sidman had been a full-time employee of the United Jewish Appeal until December 13, 1958, when he suffered a severe heart attack, rendering it impossible for him ever to work again. He was maintained on the payroll of his employer until November 1, 1959, at which time he requested payment of his "retirement allowance." In accordance with the terms of the United Jewish Appeal Field Union Contract, Sidman was paid $9,190.00 on October 15, 1959, and $9,185.00 on January 6, 1960.

He excluded $100 of salary received per week for each week in the period January 1 through October 31, 1959. He did not exclude any part of the $9,190.00 severance payment received in 1959. In his 1960 return, taxpayer did not claim any sick pay but included as income the full $9,185.00 payment received in 1960.

Thereafter Sidman timely filed a claim for refund on the basis that the severance payments received in 1959 and 1960 were excludible sick pay (to the amount of $800 in 1959, as he had already taken $4,400.00 for the period his salary was continued in that year, and to the amount of $5,200.00 in 1960). At first, the government rejected taxpayer's claim on the ground that the payments did not fall within exclusion (d) of § 105 because taxpayer had reached the voluntary retirement age of his company

(age 60) and hence was not "absent from work on account of . . . sickness." However, in light of adverse rulings in Commissioner of Internal Revenue v. Winter, 303 F.2d 150 (3d Cir. 1962), and Stewart v. United States, 313 F.Supp. 195 (W.D.Pa.1970),[2] the government conceded that the taxpayer was "absent from work" within the meaning of § 105(d), since he had not yet reached the ordinary retirement age of his company. Commissioner of Internal Revenue v. Winter, *supra,* 303 F.2d at 152.

The government now argues in its answering memorandum that, even conceding that the taxpayer was absent from work because of sickness, he may still not exclude such payments because he was not paid pursuant to a "wage continuation plan," in accordance with the requirements of § 105(d) of the Code. The government contends that taxpayer received "severance pay" which, by definition, is paid by reason of termination of the employment relation and not by reason of the "continuation" of such relation.

We agree with the government that the payments received by the taxpayer are not excludible under § 105(d) because he was not paid pursuant to a "wage continuation plan." However, finding the rationale of *Winter, supra,* persuasive, we do not adopt the government's position that termination of employment necessarily disqualifies a taxpayer from excluding payments received after termination of employment. We state the issue differently: whether the provisions of the United Jewish Appeal Field Union Contract, pursuant to which taxpayer was paid, constituted a "wage

2. After the Internal Revenue Service lost in the above cases, it conceded pending cases involving the same issue and then published Treasury Decision No. 6888, which changed Regulations § 1.105–4 to bar, for the purposes of exclusion under § 105(d), disability benefits once an employee was eligible for voluntary retirement and without reference to the customary retirement age. Treasury De-

cision No. 6888 was promulgated pursuant to the Revenue Act of 1964 P.L. 88–272, C.B. 1964–1 (part 2), and the statute was, by its terms, effective for taxable years beginning after December 31, 1963. Therefore, neither the statute nor the regulations promulgated under it could be found to control the years 1959 and 1960, which are involved in the case before us.

continuation plan" within the meaning of the statute. We hold that they do not. The taxpayer has failed to prove by a preponderance of the evidence that the payments fall within the "wage continuation plan" exception of § 105.

Section 105(a) states the general rule:

"Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income . . . ."

Section 105(d) carves out an exception to the general rule:

"Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100."

While there is no definition of "wage continuation plan" provided in the statute, Treasury Regulation § 1.105–4(2) (i) (1964) states that a "wage continuation plan" means an accident or health plan as defined in Treasury Regulation § 1.105–5(a).[3]

█ The regulation states that a "plan" may be either "insured or noninsured," meaning that the plan need not be funded by an insurance company but may be funded by the employer himself. See H.R.Rep. No. 1337, 83d Cong., 2d Sess. A33 (1954). U.S.Code Cong. & Admin.News, p. 4025. But it is clear from Treasury Regulation § 1.105–5(a) that the plan in question must be in the nature of insurance or indemnification against illness or injury. At the least, a "plan" must contain the general indicia of insurance—that is, a contract by which one party undertakes to indemnify another against loss arising from an unknown or contingent event. Law Dictionary, Ballantine's 1938 Ed., p. 660. Epmeier v. United States, 199 F.2d 508, 509–510 (7th Cir. 1952), and cases cited therein. By reading sections 105(a) and 105(d) together (as they must be since subsection (d) simply carves an exception from the general case dealt with in subsection (a)), it is clear that a "wage continuation plan" is subsumed under the general category of "accident or health insurance." Moreover, the phrase "in lieu of" in subsection (d) indicates that the payments to be excludible must be for the purpose of compensating the employee while he is unable to earn income and must pay substantial medical expenses.

The legislative history of the section also indicates that the exclusion provisions of § 105(d) were intended to apply to plans which *insure* or *indemnify* the employee for losses caused by his illness. The "sick pay" exclusion was first effectuated in § 22(b) (5) of the Internal Revenue Code of 1939, which provided that compensation for injuries or sickness were excludible if received through accident or health insurance or workmen's compensation acts. The Internal Revenue Service's position with regard to this section was that employees who received benefits under a formal insur-

---

3. The relevant part of § 1.105–5(a) reads as follows:
   " . . . In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or noninsured, and it is not neces-

sary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. . . . It is immaterial who makes payment of the benefits provided by the plan. For example, payment may be made by the employer, a welfare fund, a State sickness or disability benefits fund, an association of employers or employees, or by an insurance company."

ance policy were allowed to exclude such payments under § 22(b), while employees who received benefits on a less formal self-insured plan were not allowed to do so. Rev.Rul. 208, 1953–2 Cum.Bull. 102. Recognizing this distinction as an inequity, the Seventh Circuit in Epmeier v. United States, *supra,* and later the Supreme Court in Haynes v. United States, 353 U.S. 81, 77 S.Ct. 649, 1 L.Ed.2d 671 (1957), interpreted "health and accident insurance" broadly to include plans which, though lacking the formal indicia of an insurance policy, were, nevertheless, "an undertaking by one person for reasons satisfactory to him to indemnify another for losses caused by illness." Haynes v. United States, *supra,* at 83, 77 S.Ct. at 650. At the same time Congress took note of the inequitable distinction. Consequently, in 1954, § 105(d) was enacted to permit payments made directly by an employer under an *un*insured plan to be excluded in the same manner as payments under an insured plan. For a discussion of the legislative history of § 105 see "What Is A 'Plan' Under Internal Revenue Code Section 105(d)," 28 Ohio State L.Journal at 483 (1967). Thus it seems clear that throughout the history of the "sick pay" exclusion rule, both the courts and Congress have recognized the necessity for the employee to be paid under a plan which provides *insurance* against sickness or injury.

■ With this background, we turn our attention to the United Jewish Appeal Union Contract itself. The pertinent provisions are as follows:

"The United Jewish Appeal, Inc. recognizes that the obligation to pay severance pay for accrued services through December 31st, 1954, as provided for in the attached Code of Personnel Practices, devolves upon the corporation and shall survive the dissolution of its annual appeal.

"Pursuant to an agreement between the union and the United Jewish Appeal, Inc., the following Code of Personnel Practices of the United Jewish Appeal, National Office for the Field Staff is adopted for the year 1954.

"I. A. EMPLOYMENT DISMISSALS, PROBATIONARY PERIOD, SEVERANCE PAY.

. . . . . .

"Employees of more than two years of service, dismissed for any reasons except malfeasance, shall receive one month's notice plus severance pay at the rate of one month per year for each year of service up to a maximum of eighteen months.

"Employees of more than seven years' service, or employees who shall have reached the age of sixty (60) years, dismissed for any reasons except malfeasance, shall receive one month's notice plus severance pay at the rate of one and one-half months' pay per year for each year of service up to a maximum of twenty-seven months.

"Upon the death of any employee accumulated severance pay at the rate of one month's pay per year for each year of service up to a maximum of eighteen months for employees of less than seven years' service, and at the rate of one and one-half months' pay per year for each year of service up to a maximum of twenty-seven months for employees of more than seven years' service, shall be paid in addition to the insurance referred to in Paragraph VIII to the beneficiary or beneficiaries named in such insurance policies.

. . . . . .

"Severance pay in accordance with the above schedule, i. e., one month per year for each year of service for employees of less than seven years' service and one and one-half months per annum for employees of more than seven years' service or who have reached the age of sixty (60) years, shall be payable to any employee of more than two (2) years of service who shall leave the employ of the United Jewish Appeal, Inc. as a result

of permanent and total disability or such illness on his part or on the part of his spouse or children as incapacitates him for service in the field.

. . .
. . . . . .

"V. SICK LEAVE

"It has been the practice of the United Jewish Appeal, Inc. to give fair consideration to cases of illness, accident or other emergencies and to provide such compensation and/or care as the circumstances warrant. The United Jewish Appeal, Inc. herewith announces that it will continue such practice in as just and generous amount."

Subparagraph nine of Paragraph I.A of the contract specifices that payment shall be made to an employee "who shall leave the employ of the United Jewish Appeal, Inc. as a result of permanent and total disability or such illness on his part or on the part of his spouse or children as incapacitates him for service in the field." While at first blush this provision might indicate that the benefits of subparagraph nine are intended to compensate or insure the employee against illness, after examining the contract as a whole we think that it does not. The condition of illness or injury appears to have relevance only as a necessary condition precedent for the operation of the benefits of the contract. Illness or injury acts merely as a triggering mechanism to set in operation the formula outlined in subparagraph nine.

This interpretation of the contract is supported by the following:

First. Paragraph three of the "Preamble," which immediately precedes and refers to Paragraph I.A (entitled "Employment Dismissals, Probationary Period, Severance Pay"), pursuant to which taxpayer was paid, states that the severance payments to employees are for "accrued services." The preamble, which is not inconsistent with the operational provisions of the contract, makes it clear that the purpose of severance payments is to reward the employee for past service. No mention is made in the preamble of compensating the employee for illness or injury.

Second. The entire context of Paragraph I.A must be read as a whole, and when so viewed the thrust of the paragraph is to confer severance pay upon retiring employees for past services and not to compensate or insure against sickness or injury. The title of the section ("Employment Dismissals, Probationary Period, Severance Pay") supports this conclusion. Furthermore, the formula for determining the retirement benefits of subparagraphs two and three, which grant severance pay upon the employee's dismissal or death, is the same formula that is used in determining severance pay for those employees who have departed because of sickness or injury. Thus, while it is true that the taxpayer qualified for benefits because he became permanently disabled, what he received was retirement benefits and not insurance benefits.

Third. The taxpayer suffered his heart attack on December 13, 1958, after which he was never to return to work. From December 13, 1958, until October 31, 1959, however, he continued to receive his regular salary. On November 1, 1959, taxpayer terminated his relationship with his employer and received his severance pay in two lump sums. We outline these matters once again to highlight the significant fact that the form of payments changed after October 31, 1959 with the concurrent separation of taxpayer from the payroll. This is strong evidence that taxpayer was no longer receiving "sick pay" but some other form of benefit, and which, for exclusion purposes, destroyed the necessary relation between sickness and absence from work.

The case of Stewart v. United States, 313 F.Supp. 195 (D.C.1970), upon which plaintiff relies, does not compel a contrary conclusion. The issue there, as in the case at hand, was whether payments received by the taxpayer were made pur-

suant to a wage continuation plan; nevertheless, the court's holding was predicated on the fact that the taxpayer was eligible for *both* "early retirement." and "disability retirement." Under such circumstances, the taxpayer was allowed to treat the benefits received as disability benefits for exclusion purposes, notwithstanding the fact that he had elected to receive "early retirement" benefits. Here the parties agree that the only provision under which the taxpayer could have been paid was the severance pay provision.

Nor is Commissioner of Internal Revenue v. Winter, *supra*, conclusive as to the issue before us. The sole question before the Third Circuit was the construction of the term "retirement age." The opinion does not deal with the question whether the pension plan constituted a wage continuation plan.

Accordingly, the government's motion to dismiss the complaint is granted. The plaintiff's motion for summary judgment is denied.

It is so ordered.