ROBERT E. LAVERTY AND ELIZABETH S. LAVERTY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3335–69, 2240–70.   Filed November 6, 1973.

*William J. Currer, Jr.*, for the petitioners.
*Norman H. McNeill*, for the respondent.

TANNENWALD, *Judge:* * Respondent determined the following deficiencies and additions to petitioners' income tax:

| Docket No. | Year | Deficiency | Addition to tax (sec. 6653(a)) |
|---|---|---|---|
| 3335–69 | 1965 | $3,112.30 | $155.62 |
| 2240–70 | 1966 | 2,177.36 | 108.87 |

*Pursuant to a notice of reassignment sent to counsel for both parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Aug. 9, 1973, from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr., for disposition.

Petitioners claim overpayments of tax in the amount of $5,770.75 for 1965 and $5,885.79 for 1966. Due to concessions by the parties, the only issue to be decided in these consolidated dockets is whether section 105(c),[1] section 105(d), or section 106 allows petitioner Robert E. Laverty to exclude from his gross income payments he received from his employer in 1965 and 1966.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners are husband and wife who resided in Los Angeles, Calif., during the taxable years involved herein and at the time they filed their petitions in this case. They filed joint Federal income tax returns for 1965 and 1966 with the district director of internal revenue, Los Angeles, Calif. Robert E. Laverty will hereafter be referred to as the petitioner.

During the years in issue, petitioner was a vice president and director of Thriftimart, Inc. (hereinafter Thriftimart), a corporation engaged in the wholesale and retail grocery business through approximately 150 outlets in southern California and Nevada. Petitioner's father had the dominant voice in the operations of the corporation. He was president until his death in 1968, and petitioner succeeded him in that office. Petitioner's brother was also a vice president of Thriftimart during the years in issue. The Laverty family owned a substantial portion of Thriftimart's stock.

Petitioner began to work for Thriftimart on a full-time basis in 1946. In 1957, he held the position of sales manager. On May 7, 1957, while traveling on business for Thriftimart, petitioner was seriously injured in an airplane crash. He was hospitalized for about 5 months and confined to bed at his home for several months thereafter. He lost the sight of his right eye. Fractures of his jaw, left clavicle, right humerus, and three vertebrae all mended satisfactorily but left him with a permanent partial loss in his range of motion. Severe disfigurement of his face was repaired by extensive plastic surgery so that by 1965 and 1966 petitioner was able to appear in television commercials for Thriftimart, but scars were to a degree still visible on his face and body.

When petitioner had recovered sufficiently from the accident, his physician initially prescribed light exercise with weights in a gym under the supervision of a physical therapist. By May of 1958, petitioner was following a prescribed daily regimen of physical therapy.

---

[1] Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

As his condition improved, his doctor allowed him to substitute regular participation in sports such as golf, tennis, and swimming in place of the physical therapy activities that he found less enjoyable. His physical condition was such that failure to engage in regular physical activity for more than a few days at a time caused the return of certain symptoms he had experienced after the accident, including numbness and a tingling sensation in his lower extremities, muscles spasms, pain and stiffness in his back, and the consequent impairment of his ability to move about. As the years passed, petitioner's familiarity with the prescribed routine of exercise progressed to the point where it was unnecessary for him to visit the doctor regularly. He would consult with his physician only in the event that something new or unusual arose in his condition. During the years in issue, he was able to determine, by the way he felt, the need for any changes in the extent or nature of his physical activity.

Petitioner was unable to return to work for some 10 or 11 months following the accident. When he first returned to his office in Thriftimart's executive office building, it was for only 2 hours a day. As his condition improved, he progressively increased his regular working hours. In 1965 and 1966, he followed the regular weekly schedule described below in regard to his office hours and physical activity. Petitioner frequently had to rearrange this usual schedule, however, in order to accommodate the needs of Thriftimart. For example, he often found it necessary to rearrange his normal schedule in order to meet with other officers and employees of Thriftimart in distant locations such as Thriftimart's warehouses, markets, meatpacking plant, and other facilities.

On Mondays and Fridays during the years in issue, petitioner would usually spend about 20 minutes doing calisthenics before breakfast. He would arrive at his office about 8:15 a.m. and work until 11:30 a.m. At about that time, he would change into a running suit, do some calisthenics to limber up, and then run about a mile in the streets around Thriftimart's office building. He returned to his office about 12:15 p.m., showered, relaxed, and ate lunch. He would then work in his office until about 4:45 p.m. On Tuesdays and Thursdays during the years in issue, he would arrive at his office about 8:15 a.m. and work until 11:30 a.m. He would then leave to play a round of golf, walking the course rather than riding a cart and returning home at about 6 p.m. On Wednesday, he would normally work in his office from 8:15 a.m. to 2:15 p.m., play paddle tennis at the beach from about 3 p.m. to 5 p.m., and return home at 6 p.m. On Saturdays, he would usually spend the morning and afternoon until about 3 p.m. checking Thriftimart's retail stores. He would also spend about a half hour doing

calisthenics and swimming in his pool. During the years in issue, petitioner would often fly to San Diego or Las Vegas on Saturday evening, check on Thriftimart's operations in those cities on Sunday morning, and play golf or tennis in the afternoon.

Thriftimart's executive offices were open for the transaction of business every Monday through Friday, except holidays, from 8 a.m. to 4:45 p.m. As an executive of Thriftimart, petitioner had no formal work day as such and was not required to account for his absences during business hours regardless of the business or personal nature of the absence. He had a personal secretary, who was usually aware of where petitioner might be reached at all times during business hours. During the years in issue, petitioner was contacted and conducted Thriftimart's business away from his office or at his home after normal business hours when special matters or emergencies required his attention. He was not paid additional compensation by Thriftimart for "overtime" work. During the years in issue, petitioner took 4 weeks of paid vacation, including 2 weeks of skiing during the winter.

In 1965 and 1966, petitioner experienced no new or unusual complaints related to the aircraft accident and he had no contact with his physician other than routine examinations and consultations unrelated to his previous injuries.

At all times material herein, Thriftimart was a self-insurer with respect to its workmen's compensation obligations under the laws of California. Pursuant to its workmen's compensation plan, in 1957 Thriftimart paid petitioner's physicians or reimbursed petitioner for medical expenses in the amount of $14,667.85 incurred in connection with injuries suffered in the aircraft accident. On October 9, 1959, petitioner released Thriftimart of all further workmen's compensation claims related to the aircraft accident and received a payment of $2,700. At that time, petitioner's father, who was president of Thriftimart, indicated to petitioner that he would continue to receive his full salary regardless of the amount of time he would be absent from work because of the injuries he suffered in the aircraft accident and his resulting need for a prescribed routine of physical activity.

Petitioner's compensation was fixed annually by Thriftimart's board of directors without petitioner's participation. Since the time of the accident on May 7, 1957, he has received his full salary unreduced for any of his absences from work due to the injuries sustained in the accident. Over the years as he advanced to positions of increased responsibility within Thriftimart's management, his salary has increased commensurately. In 1965 and 1966, his base annual salary was $37,700, plus incentive pay based on Thriftimart's sales. Petitioner's total compensation from Thriftimart was $55,922.52 in 1965 and

$54,873.28 in 1966. These amounts were recorded on the books, records, and tax returns of Thriftimart simply as salary.

During the years in issue, Thriftimart had a wage continuation plan for its salaried employees who were absent from work due to sickness or injury. Thriftimart paid each such employee his full salary, reduced by the amount of State disability insurance benefits received, for a period determined by paying 1 week's salary for each year he had been employed by Thriftimart. These payments were recorded by Thriftimart in its payroll records as "sick leave payments" or "sick pay."

In addition to the wage continuation plan, Thriftimart had an unwritten arrangement, known to the employees who might be eligible, that a long-time salaried employee of the corporation who held a responsible position would be paid his full salary when he returned to work after an illness or injury, although such employee may have been unable to be present at work for the entire business day or his productivity may have been impaired by the illness or injury. If such an employee was not expected to recover sufficiently from his illness or injury to permit him adequately to fulfill the duties of his position, he would be given the choice of immediate retirement or reassignment to a new position of lesser responsibility and a correspondingly reduced salary. There were no established rules during the years in issue regarding the implementation of this arrangement—whether or not a particular employee would be entitled to benefits thereunder and for how long was a decision within the discretion of Thriftimart's president.

During the taxable years in issue, petitioner was covered by State disability insurance but submitted no claims to Thriftimart or the State Department of Employment for any illness or disability connected with the 1957 accident.

Petitioner estimated that his need to engage in a daily routine of physical activity caused a 25-percent decrease in his working time for Thriftimart during the years in issue. For that reason, petitioners stated in their Federal income tax returns for 1965 and 1966 that petitioner "worked on a part-time basis receiving 25% sick pay and 75% salary," and they excluded from their gross income in each of those years $1,300 of petitioner's salary from Thriftimart, or 25 percent of the maximum exclusion specified in the first sentence of section 105(d). Respondent disallowed the exclusions in their entirety.

OPINION

Petitioner was a vice president and director of Thriftimart, a large supermarket chain, during the years in issue. As a result of injuries

sustained in an airplane crash while traveling on business for Thrifti-mart several years before, petitioner suffered a total loss of sight in one eye and a permanent partial disability in the range of motion of his arms, back, and lower extremities. For a number of hours in each business day, petitioner was away from his office at Thriftimart in order to engage in a prescribed routine of physical activity necessi-tated by his injuries. He received salary and incentive bonuses from Thriftimart in the total amount of $55,922.52 in 1965 and $54,873.28 in 1966.

Petitioner now claims the right under section 105(c) or 106 to exclude from gross income a full 25 percent of the total compensation he received from Thriftimart in 1965 and 1966. In the alternative, he asserts the right to an exclusion under section 105(d), as originally claimed in his returns for those years.[2]

We pause first to dispose of petitioner's claim for any exclusion un-der section 106.[3] His reliance on that provision is misplaced. Section 106 has no application to payments an employer makes directly to his employee, such as the compensation petitioner received from Thrifti-mart. It deals only with the treatment of *contributions* by an employer to an accident or health plan for the benefit of his employees, either in the form of contributions to a separate fund or trust or by the payment of premiums on a policy of accident or health insurance. H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 15, A35 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 185–186 (1954); sec. 1.106–1, Income Tax Regs.

The main thrust of petitioner's argument centers upon section 105(c) and (d), which exclude certain types of payments under accident and health plans from the general rule of includability in gross income contained in section 105(a).[4]

Petitioner contends that 25 percent of the total compensation he received from Thriftimart in 1965 and 1966 is excludable from his gross income under section 105(c). He argues as follows: (1) He suffered the permanent loss or loss of use of a member or function of the body; (2) this caused a decline in his productivity for Thrifti-mart, which can be measured as the percentage decrease in petitioner's

---

[2] Petitioners make a claim in passing that the payments in question are excludable under sec. 104, dealing with workmen's compensation. But they do not press the point and, in any event, it is not a sustainable position. *American Foundry*, 59 T.C. 231, 237 (1972).

[3] SEC. 106. CONTRIBUTIONS BY EMPLOYER TO ACCIDENT AND HEALTH PLANS.
Gross income does not include contributions by the employer to accident or health plans for compensation (through insurance or otherwise) to his employees for personal injuries or sickness.

[4] Insofar as pertinent herein, sec. 105 reads as follows:
SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS.
(a) AMOUNTS ATTRIBUTABLE TO EMPLOYER CONTRIBUTIONS.—Except as otherwise pro-vided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such

normal office hours (which petitioner claims to be 25 percent) due to his absences for the exercise necessitated by his physical condition; (3) despite his loss of productivity, Thriftimart paid petitioner in 1965 and 1966 the full salary for the position he held; and (4) 25 percent of such payments were necessarily computed with reference to the nature of the injury and without regard to the period petitioner was absent from work, because during the years in issue he was not absent from work within the meaning of section 1.105–4(a)(5), Income Tax Regs.[5]

Respondent does not dispute that petitioner suffered the permanent loss or loss of use of a member or function of his body within the meaning of section 105(c)(1). See sec. 1.105–3, Income Tax Regs. He takes the position however, that the amounts petitioner received from Thriftimart were simply taxable compensation for services ren-

---

amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer.

\* \* \* \* \* \* \*

(c) PAYMENTS UNRELATED TO ABSENCE FROM WORK.—Gross income does not include amounts referred to in subsection (a) to the extent such amounts—

(1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and

(2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

(d) WAGE CONTINUATION PLANS.—Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. The preceding sentence shall not apply to amounts attributable to the first 30 calendar days in such period, if such amounts are at a rate which exceeds 75 percent of the regular weekly rate of wages of the employee (as determined under regulations prescribed by the Secretary or his delegate). If amounts attributable to the first 30 calendar days in such period are at a rate which does not exceed 75 percent of the regular weekly rate of wages of the employee, the first sentence of this subsection (1) shall not apply to the extent that such amounts exceed a weekly rate of $75, and (2) shall not apply to amounts attributable to the first 7 calendar days in such period unless the employee is hospitalized on account of personal injuries or sickness for at least one day during such period. If such amounts are not paid on the basis of a weekly pay period, the Secretary or his delegate shall by regulations prescribe the method of determining the weekly rate at which such amounts are paid.

(e) ACCIDENT AND HEALTH PLANS.—For purposes of this section and section 104—

(1) amounts received under an accident or health plan for employees \* \* \*

\* \* \* \* \* \* \*

shall be treated as amounts received through accident or health insurance.

[5] Sec. 1.105–4(a)(5) states:

For the purpose of section 105(d), whether an employee is absent from work depends upon all the circumstances. \* \* \* An employee is not absent from work when he performs any services for his employer at his usual place or places of employment, whether or not the services are the usual services performed by the employee. Furthermore, the employee is not absent from work when he performs substantial services for his employer, even though they are performed at a place other than his usual place of employment. Thus, if an employee returns to his usual place or places of employment and performs any services for his employer, he has returned to work, but if he merely holds occasional short conferences concerning his work with other employees or clients while hospitalized or at home recuperating, such conferences do not constitute a return to work.

dered and not payments in the nature of indemnity for the losses specified in section 105(c)(1).

Assuming *arguendo* that fragmentation of a gross payment can, under certain circumstances, satisfy the requirements of section 105(c), we think it clear that petitioner must fail in respect of his claim. Subsection (1) of section 105(c) requires that the amount "constitute payment *for* the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement of the taxpayer." (Emphasis supplied.) In other words, the loss must be the cause of the payment. The record herein simply does not sustain the proposition that any portion of what petitioner received bears the necessary causal relationship. First, there is no indication as to what the "full salary" for the position occupied by petitioner would have been if it were occupied by someone without his disabilities. Secondly, while we do not discount the handicaps petitioner was forced to overcome, there is no indication that his effectiveness as an officer of Thriftimart was in any way impaired during the years in issue. To the contrary, his eventual promotion to Thriftimart's presidency tends to indicate that he more than adequately fulfilled the duties of his position. Indeed, we are satisfied that there was no reduction in petitioner's productivity for Thriftimart.[6] It appears that his practice of working on Thriftimart's business during the evening and on weekends adequately compensated for his absences from the office during the day and that longer hours at the office were not needed to better fulfill the duties of his position. Thirdly, and most importantly, there is no indication that Thriftimart meant to pay petitioner anything other than compensation for the services he rendered. Thus, it does not appear that Thriftimart ever considered a reduction in his salary during the years in issue or had reason to do so. Furthermore, petitioner testified that he was told by his father, who was Thriftimart's president at the time, that petitioner would continue to receive his full salary despite any absences related to the accident.

Furthermore, the payments that petitioner received from Thriftimart do not satisfy the requirements of section 105(c)(2). The evidence indicates that, within broad guidelines established by his physician, petitioner was free to schedule the timing and duration of his physical activity at his own convenience and according to his own preferences. In fact, petitioner frequently rearranged his routine of physical activity in order to accommodate the business needs of Thriftimart. Thus, while petitioner may be correct on his contention that any payments he received from Thriftimart were necessarily computed without regard to the period he was absent from work (since he was not absent from work within the meaning of section

---

[6] The only specific example of "loss of productivity" to which petitioner could point a change in his golf handicap from 9 to 16.

1.105–4(a)(5), Income Tax Regs.), it cannot be said that any such payments were computed with reference to the nature of his injuries as required by section 105(c)(2).

We turn next to petitioner's alternative claim for a "sick pay" exclusion under section 105(d). See fn. 4 *supra.* That section allows an exclusion for payments made in the nature of indemnity for an employee's loss of wages on account of absences for personal injury or sickness.[7] H. Rept. No. 2543, 83d Cong., 2d Sess., p. 25 (1954).[8] See also *Sidman* v. *United States*, 336 F. Supp. 474, 476 (S.D.N.Y. 1971), affirmed per curiam (C.A. 2, 1972).

The sine qua non of the application of section 105(d) is that the employee be "absent from work on account of personal injuries or sickness." Petitioner contends that his absences from the office for a few hours each business day constituted absence from work within the meaning of that section. We think this claim must be rejected. It is clear to us that petitioner was not "absent from work," the payments he received were simply compensation for services rendered, and consequently the exclusion of section 105(d) does not apply. *Estate of Leo P. Kaufman*, 35 T.C. 663, 667 (1961), affd. 300 F. 2d 128 (C.A. 6, 1962); *Sidman* v. *United States, supra* at 478. Cf. *Hall* v. *United States*, 242 F. 2d 412, 414 (C.A. 7, 1957). See also secs. 1.105–4 (a)(2)(ii) and 1.105–4(a)(5), Income Tax Regs.[9] See and contrast *Niekamp* v. *United States*, 240 F. Supp. 195 (E.D. Mo. 1965).

In view of the foregoing, we need not reach the further issue, raised by respondent, as to whether the arrangement under which petitioner received the payments in question constituted an accident or health plan within the meaning of section 105.

To reflect the concessions of the parties in regard to other issues,

*Decisions will be entered under Rule 50.*

---

[7] The term "wages" found in sec. 105(d) is used in the broad sense to include salary and other remuneration for employment. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 184 (1954); sec. 1.105–4(e)(5)(iii), Income Tax Regs.

[8] See also H. Rept. No. 749, 88th Cong., 1st Sess., p. 44 (1963), and S. Rept. No. 830, 88th Cong., 2d Sess., pp. 49–50 (1964) (the committee report references to the amendment of sec. 105(d) made by the Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 19).

[9] See also *Frank A. Thomas,* T.C. Memo. 1969–108; *Stanley J. Piwowarski,* T.C. Memo. 1961–288.