Stewart and Lillian CAPLIN, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 1469, Docket 83–6074.

United States Court of Appeals, Second Circuit.

Submitted June 16, 1983.

Decided Sept. 29, 1983.

Alan Prigal, New York City, filed a brief for plaintiffs-appellants.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Jordan Stanzler, Leona Sharpe, Thomas D. Warren, Asst. U.S. Attys., New York City, of counsel), filed a brief for defendant-appellee.

Before FRIENDLY, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge.

This appeal is from the dismissal of a suit seeking a tax refund. In the fall of 1977, appellant Stewart Caplin's neurofibroma—a neurological impairment causing loss of use of the limbs—became more acute. As a result of appellant's deteriorating medical condition, he retired in June 1978 after 38 years of service with the Union Card and Paper Company (Company or Union Card). Mr. Caplin, who was then 60 years old, received a lump sum payment of $305,815.97 from Union Card's Profit Sharing Plan.[1] The question before us is whether this sum represented deferred compensation and was therefore taxable to him as income under section 402(a) of the Internal Revenue Code of 1954, as amended, (I.R.C.) or whether the payment constituted a disability payment exempt from taxation under I.R.C. § 105(c).[2] In this case we have little

---

1. The record indicates that Caplin's profit sharing account was worth $315,895.97 as of June 30, 1978. However, since Caplin had borrowed $10,000 from his account, he was entitled to receive and received a lump sum cash payment of $305,895.97 upon his retirement from Union Card. Caplin reported this amount on his return, rather than the full amount of his account in the plan. The $10,000 omission from income discovered in the course of the litigation is not an issue in dispute.

2. § 105. Amounts received under accident and health plans

   *    *    *    *    *    *

(c) Payments unrelated to absence from work

doubt that the lump sum payment constituted taxable income to the taxpayer. Before discussing the reasons which led us to this conclusion, we set forth briefly some necessary additional facts.

## I

In 1955, Union Card instituted a Profit Sharing Plan. Under the 1976 Plan, now before us, each participant has an account in his or her own name, to which amounts allocated are credited in accordance with a formula spelled out in the Plan. All the contributions to the Plan are made by the Company.

The provisions of the Plan are set forth in ten Articles. The one most pertinent to this appeal is Article VI, entitled "Vesting and Benefits." Section 6.1 of that Article provides for the non-forfeitable (vested) portion of a participant's share to increase with the years of service with the Company. Thus, during the first three years of service, no non-forfeitable percentage accrues to a participant. After three years of service, the non-forfeitable percentage amounts to 30%. Then, it increases by 10 percent each year, until completion of the tenth year of service, where the non-forfeitable percentage of a participant's share is 100%. Additionally, section 6.1 provides "that if any Participant shall attain sixty-five (65) years of age, or shall die, or shall leave the employ of the Company because of permanent disability, then one hundred (100%) percent of his share shall become his Vested Share regardless of the number of Years of his employment." Section 6.2(a) provides in substance that a participant who has suffered a "permanent disability" shall be 100% vested in his account. Subdivision (b) of section 6.2 defines "permanent disability" and grants to the Plan's Committee the right, in its discretion, to have a physician examine a participant and render a medical opinion. Under the Plan, the Committee retains the right to make the final determination as to whether a participant is or is not suffering from a permanent disability. Subdivisions (c) and (d) respectively provide for further physical examinations by the Committee's physician and for termination of further benefits if the Committee determines that a participant is no longer disabled.

Mr. Caplin was a participant in the Plan from its inception. At the time of his retirement in 1978, he was the President of Union Card. Following his departure, a letter dated July 26, 1978 was sent to the Trustee of the Plan from the Committee stating that Mr. Caplin owned "59,192 units whose market value on June 30, 1978 were worth 5.3368 [dollars] per unit. Under the terms of the Profit Sharing Plan he is entitled to 100% of the value of said units." The letter closed with a direction from the Committee to the Trustee to pay the taxpayer $305,895.97. At the trial, Mr. Cohen, the member of the Committee who authored the letter, reaffirmed that in an earlier deposition he had stated that the determination of Mr. Caplin's status as a 100% vested participant in the Plan was based upon the length of his employment with the Union Card, i.e., more than ten years. Mr. Cohen also testified that the Committee believed that Mr. Caplin would have been entitled to his full share either because of his length of service with the Company or because of his disability. The Committee, however, apparently did not invoke the procedures prescribed by the Plan with regard to a formal finding of disability.

Taxpayer and his wife reported the $305,895 lump sum payment on their joint return for the calendar year 1978 and paid $62,761 in income taxes.[3] In 1980, they filed an

---

Gross income does not include amounts referred to in subsection

(a) to the extent such amounts—

(1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and

(2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

**3.** On the 1978 joint return, $248,540, representing pre-1974 compensation, was reported on

amended return claiming a refund on the ground that the lump sum payment was excludable under I.R.C. § 105(c). The Internal Revenue Service disallowed their claim, and taxpayer and his wife thereafter instituted this suit for a refund in the United States District Court for the Southern District of New York (Werker, J.).

At the close of the trial, the government moved for and obtained a directed verdict under Fed.R.Civ.P. 50(a). In granting the motion, the district court focused on I.R.C. § 105(c)(2), which excludes from gross income amounts constituting payment for permanent loss or loss of use of a member or function of taxpayer's body when the amounts "are computed with reference to the nature of the injury without regard to the period the employee is absent from work." Judge Werker concluded that since the nature of Caplin's condition was not considered in computing the lump sum payment, the second requirement of section 105(c) had not been met.

## II

For the taxpayer to exclude the lump sum payment from his income, he must first show that the amount he received as an employee was received through accident or health insurance or through an employee's accident or health plan for personal injury or sickness. See I.R.C. § 105(e)(1), Treas. Reg. § 1.105–5(a) (1964). He must next prove that the amount constituted payment for the permanent loss or loss of use of a member or function of his body under I.R.C. § 105(c)(1). And, finally, he must demonstrate that the amount of the payment was "computed with reference to the nature of the injury without regard to the period [he was] absent from work." I.R.C. § 105(c)(2).

Since the Plan in this case is plainly labelled a "Profit Sharing Plan", the taxpayer is forced to contend that it serves in a dual capacity as an accident or health plan as well. The Treasury Regulations permit this dual function. See Treas.Reg. § 1.401–

1(b)(1)(ii) (1976). To establish that Union Card's Profit Sharing Plan was also an accident or health plan, Caplin relies principally upon *Wood v. United States,* 590 F.2d 321 (9th Cir.1979) and *Masterson v. United States,* 478 F.Supp. 454 (N.D.Ill.1979). In *Wood,* the trial court found that the profit sharing plan at issue did qualify as an accident or health plan under I.R.C. § 105, and on appeal, the government took no issue with that finding. In the instant case, Judge Werker did not make such a finding. He stated only that an employee benefit plan *may* serve a dual purpose as both a profit sharing and accident or health plan. He did not state that the Union Card Plan served a dual purpose. Thus, the present case is distinguishable from *Wood.* In *Masterson,* the district court cited *Wood* for the proposition that the characterization of a payment focuses not on its source, but on the circumstances under which it is made. *Masterson,* 478 F.Supp. at 455. What apparently led the *Masterson* court to that conclusion was this sentence in the *Wood* opinion: "Until actually made in an individual case, the precise nature and taxable status of a payment remains uncertain." *Wood,* 590 F.2d at 323.

This statement may well be true where there is, in fact, a plan designed to serve a dual purpose. However, it is not a reliable guide for beginning an analysis of whether a lump sum payment is or is not excludable from income. To decide that issue on an *ad hoc* or *post facto* basis depending on the circumstances under which a payment is made not only puts the cart before the horse, but also ignores the legislative scheme. In order to claim entitlement to income exclusion, Congress envisioned, first, that there be a plan, and, second, that the taxpayer prove he meets its conditions. See *American Foundry v. Commissioner,* 536 F.2d 289, 293 (9th Cir.1976), *Larkin v. Commissioner,* 48 T.C. 629 (1967), *aff'd* 394 F.2d 494 (1st Cir.1968), *Lang v. Commissioner,* 41 T.C. 352 (1963).

---

schedule D as a long term capital gain thus eliminating $124,270 from gross income by means of the capital gain deduction, and $57,-

356 was reported as ordinary income subject to the ten-year forward averaging provisions of IRC § 402(e).

Generally, profit sharing plans and accident or health plans serve different purposes. Profit sharing plans are designed to provide an employee with deferred compensation, the amount of which depends upon the success of the business and the employee's position in that business. On the other hand, accident or health plans are designed to provide payments to employees in the event of illness or injury, without regard to the profitability of the business. In a lean year, an employee could properly expect his employer to contribute less money into a profit sharing plan than he might expect in a more profitable year. But, if that same employee suffered an injury, he would not expect his benefits under an accident or health plan to fluctuate according to the profitability of the enterprise. It was with these considerations and purposes in mind that Congress set forth *specific* rules for the tax treatment of amounts received pursuant to profit sharing plans and accident or health plans. See IRC §§ 401 and 105. *See* S.Rep. No. 1622, 83d Cong., 2d Sess. § 105 (1954), *reprinted at* 3 U.S.Code Cong. & Ad.News 4621, 4645–46, 4818–20. *See also* Meyer, *Tax Aspects of Distributions From Qualified and Non-Qualified Plans,* 1959 S.Cal.Tax Inst. 811; Comment, *Taxation of Employee Accident and Health Plans Before and Under the 1954 Code,* 64 Yale L.J. 222 (1954).

[1, 2] Under a qualified profit sharing plan, an employee realizes taxable income upon his receipt of distributions. IRC § 402. Congress also taxes amounts received pursuant to accident or health plans, but has set forth a number of specific exceptions in which amounts received by a taxpayer are exempt from taxation. IRC § 105. The government argues that since the exceptions spell out "precise conditions" for excludability, the exclusion provided under § 105(c) was intended to be narrow. It seems more likely to us that due to the unfortunate circumstances surrounding a taxpayer's need to receive these payments, Congress decreed that they not be subject to income taxes—so as to avoid adding insult to injury. Nevertheless, the taxpayer has to prove his entitlement to a tax benefit by demonstrating that he meets the statutory conditions upon which it is granted. Thus, the section need not be construed broadly or narrowly, but the conditions it lays down must be met. *See American Foundry v. Commissioner, supra; Estate of Kaufman v. Commissioner,* 35 T.C. 663 (1961), *aff'd by order* 300 F.2d 128 (6th Cir.1962); Comment, *The Legal Benchmarks of a Plan For Employees: A Navigational Framework Under Section 105,* 8 Loy.L.A.L.Rev. 363 (1975); *See generally* Miller, *Accident and Health Plans: A Way to Provide Selective Fringe Benefits For Employees,* 3 Tax'n for Accts. 216 (1968). In our view, the requirements for excluding income under § 105(c), which would otherwise be taxable under § 402(a), are not met by the simple expedient of changing the labels attached to the payments at the time the payments are made. For these reasons, we consider *Wood* and *Masterson* to be of no help to the taxpayer.

### III

We next turn to an analysis of whether Union Card's Plan in fact served in a dual capacity as an accident or health plan and address the requirements necessary to institute such a plan. Treasury regulations provide, in general, that such a plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. The plan may cover one or more employees, and there may be different plans for different employees. It may be insured or not, and it need not be in writing to be enforceable, nor need the employee's rights to benefits under the plan be enforceable. However, if an employee's rights are not enforceable, an amount will be deemed received under a plan only if on the date an employee became sick or injured, he was covered by a plan (or program, policy or custom having the effect of a plan) providing for payments to him in the event of sickness or injury, and knowledge of such plan was reasonably available to him. Treas.Reg. § 1.105–5.

Under such a loose formulation, it is difficult to conceive of what would *not* constitute an accident or health plan. It could be argued, for example, that a casual conference on sickness benefits at the corporate water cooler by Caplin, as Company President, and Cohen, the Committee member who authored the July 26th letter, constitutes an accident or health plan. We read the regulation—however informal it may appear—as still requiring a definite method of doing something. By definition, a "plan" must be formulated as a program for actions to achieve an end. *Webster's Third New International Dictionary,* 1729 (1981). Ordinarily, a definite program to provide accident or health coverage will be accompanied by certain indicia reflecting the plan's purpose. Thus, for example, such a plan, if written, could state that its purpose is to qualify as an accident or health plan within the meaning of the Internal Revenue Code of 1954, as amended, and that the benefits payable under it are eligible for income tax exclusion. Ordinarily, it is specified that the benefits payable under an accident or health plan are those amounts incurred for medical care in the event of personal injury or sickness. It could also specify that the benefits payable be limited to those amounts incurred for medical care in the event of personal injury or sickness, and provide for the specific reimbursement of such expenses. Further, a plan might allow an employee to be compensated for specific injuries or illnesses, such as the loss of use of an arm or leg. While these and other like provisions are not prerequisites to the existence of an accident or health plan, their absence plainly militates against a finding that a profit sharing plan serves a dual purpose. Although the Union Card Profit Sharing Plan was quite detailed, none of those to-be-expected provisions are found. Further, there is no proof that, in the 23 years since its inception, any accident or health claim was ever made or paid under the Company's Profit Sharing Plan. This is mute testimony against the existence of a dual purpose.

In a tax refund suit, the burden of proof is on the taxpayer to prove an overpayment of tax. *See United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *DeLorenzo v. United States,* 555 F.2d 27, 29 (2d Cir.1977). In this case, the taxpayer has simply failed to prove that there was in fact an accident or health plan in existence as part of the Company's Profit Sharing Plan. The permanent disability provision contained in that Plan, discussed earlier, was merely one of several that could trigger a participant's claim to his vested interest. In our view, Union Card's Profit Sharing Plan was not designed to and did not serve a dual purpose.

## IV

Even were we to derive the existence of a plan providing for health benefits from the disability language contained in Article VI, the taxpayer here failed to invoke such provisions. Further, even if the taxpayer had proved the existence of an accident or health plan and had invoked its provisions, he still failed to carry his burden of proof with respect to meeting the requirements of IRC § 105(c)(2). The Plan's committee made no requisite determination that Caplin was disabled, and all the evidence at trial demonstrated that Caplin's benefits were computed solely on the basis of his length of service and not on the basis of his disability. Therefore, the district court's finding that the conditions of IRC § 105(c)(2) were not met is fully supported by the record. *See Hines v. Commissioner,* 72 T.C. 715, 720 (1979) (denying § 105(c) treatment to incapacitated pilot where the amount of the distribution was not based on the nature of his injury); *See also, Laverty v. Commissioner,* 61 T.C. 160, 167 (1973) *aff'd* 523 F.2d 479 (9th Cir.1975) (per curiam).

For all these reasons, the judgment is affirmed.