JIMMY ROGERS MARSHALL & EVELYN ROSE MARSHALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marshall v. Commissioner
Docket No. 24064-87
United States Tax Court
T.C. Memo 1989-5; 1989 Tax Ct. Memo LEXIS 4; 56 T.C.M. (CCH) 1006; T.C.M. (RIA) 89005; 10 Employee Benefits Cas. (BNA) 1683; January 5, 1989; As amended January 9, 1989 Brent Edward Vallens, for the petitioner. Mary Tseng, for the respondent. NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION NAMEROFF, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) of the Internal Revenue Code and Rules 180, 181 and 182. [1] Respondent determined a deficiency in petitioners' 1985 income tax return in the amount of $ 5,270. The sole issue for decision is whether the amount in dispute may be excluded from gross income under section 106. [2]
*6 FINDINGS OF FACT The facts in this matter have been fully stipulated and are so found. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners are husband and wife who resided in Riverside, California at the time their petition was filed in this case. Petitioners timely filed a joint Federal income tax return for the 1985 tax year with the Internal Revenue Service at Fresno, California. In addition, petitioners filed an amended joint income tax return for the same tax year. Petitioner-husband had worked at Kaiser Steel Corporation ("Kaiser") as a steelworker for 23 years. He retired from Kaiser on November 15, 1983. Prior to January 1, 1985, Kaiser provided health care benefits pursuant to the Kaiser Steel Health and Insurance Plan ("HIP") for all of its eligible retirees, surviving spouses, and their eligible dependents. [3] The HIP was established pursuant to a 1980 Insurance Agreement entered into by Kaiser and the United Steelworkers of America ("Union"). The cost of the health care benefits was paid entirely by Kaiser. The right to the health care benefits required no contributions by the retirees either before their retirement, *7 as employees, or after their retirement, as retirees. In 1984, a dispute arose between Kaiser and the retirees, who were represented by the Union. The dispute involved whether Kaiser had a contractual duty under the aforementioned 1980 Insurance Agreement to continue providing health care benefits to eligible individuals after December 31, 1983. There was also the question whether Kaiser had the financial capacity to continue providing these health care benefits beyond that date. On September 14, 1984, Kaiser and the Union entered into a Memorandum of Understanding wherein Kaiser offered to continue providing health care benefits to all eligible individuals [4], but in a modified form. The Memorandum of Understanding contained the following points: 1. Full benefits under the HIP would continue for all eligible individuals through December 31, 1984. 2. With respect to the period subsequent to December 31, 1984, a Program *8 of Continuing Coverage would be established. Under the Program, Kaiser would continue to pay the full cost of the HIP benefits to all eligible individuals subject to certain modifications; viz, effective January 1, 1985, Kaiser would no longer pay for the following HIP benefits: (a) dental, (b) vision care, and (c) major medical for all retirees and surviving spouses under age 65 and their dependents, except for permanently incapacitated retirees, their surviving spouses and dependents. 3. Effective January 1, 1985, an ongoing contributory program would be established whereby those eligible individuals who no longer had Company-paid coverage for the dental, vision care, and major medical benefits would be able to continue self-paid coverage at group rates. To the extent permissible by law, this program would be paid for through deductions from pension checks. 4. From January 1, 1985 to December 31, 1994, Kaiser would pay for major medical benefits as provided for in the HIP for all eligible retirees and surviving spouses age 65 and over (including, from age 65, those who reach age 65 during this period) and their dependents and for permanent incapacitated retirees, their surviving *9 spouses and their dependents. As an alternative to receiving Company-paid major medical benefits during this period, eligible individuals could elect to receive Company-paid dental and vision benefits. On January 1, 1995, Kaiser's obligation to pay for these benefits would cease. 5. Subsequent to December 31, 1984, the HIP Prescription Drug program would be continued in a revised form. The former $ 1.00 deductible for prescription drugs would be increased to $ 3.00. In addition, Kaiser stated that it would establish a mail order prescription/generic drug program which would offer participants the opportunity to have prescriptions filled with no deductible. Petitioners received a joint letter from Kaiser and the Union dated September 20, 1984. The letter, which contained a copy of the Memorandum of Understanding, explained the options available under that document. An individual could elect to participate in the Program of Continuing Coverage. Those individuals who elected to participate in the Program were required to waive all legal rights they either had or may have had under the 1980 Insurance Agreement. In the alternative,, an individual could elect not to participate *10 in the Program of Continuing Coverage. However, retirees and surviving spouses who made this election were placed in a position of uncertainty. Kaiser had expressed its intent to discontinue all health benefits provided under HIP (except life insurance) effective January 1, 1985, the day following the expiration of the 1980 Insurance Agreement. The Union believed that such a discontinuance would violate Kaiser's obligations under the agreement. Although eligible individuals could take legal action in an effort to enforce their rights under the Insurance Agreement, there was no guarantee that litigation would prove fruitful. The final option available under the Memorandum of Understanding was a lump-sum buyout. In a letter dated September 24, 1984, Kaiser formally offered this alternative to its eligible retirees and surviving spouses. In exchange for the lump-sum buyout, recipients were required to surrender all rights they had to health care benefits from Kaiser after December 31, 1984. Under the lump-sum buyout option, the amount to be received by any electing retiree or surviving spouse was to be determined by reference to the age and marital status of each electing retiree *11 or surviving spouse. To accept the lump-sum buyout offer, the eligible individual was required to execute and return to Kaiser an "Application for Lump-sum Buyout and Release of Liability" by October 22, 1984. Petitioners elected to receive the lump-sum buyout and timely executed an appropriate application, which was received by Kaiser on October 18, 1984. Following Kaiser's acceptance of the application, petitioners were entitled to receive a gross (before withholding) lump-sum buyout in the amount of $ 18,000 in April 1985. Kaiser had informed petitioners in the September 24th letter that amounts received under the lump-sum buyout election would constitute taxable income. Consequently, Kaiser withheld Federal and state income taxes totaling $ 4,140 from the $ 18,000 lump-sum payment. Although Kaiser placed no restrictions on the use or disposition of the lump-sum buyout payments received by eligible individuals, petitioners set aside the amount they received to purchase health insurance. [5]
*12 Initially, petitioners included $ 18,000 on their original joint Federal income tax return. In September 1986, petitioners filed an amended tax return seeking a refund in the amount of $ 5,270, based upon an exclusion of the $ 18,000. Subsequently, petitioners received a refund for 1985 in the amount of $ 5,270. Thereafter, a notice of deficiency was issued to the petitioners determining a deficiency in the amount of $ 5,720. Respondent determined that the $ 18,000 lump-sum buyout payment constituted taxable income to the petitioners. OPINION Section 61(a) of the Internal Revenue Code defines gross income broadly as "all income from whatever source derived." The Supreme Court has consistently given this definition of gross income a liberal construction "in recognition of the intention of Congress to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430 (1955); see also United States v. Stewart,311 U.S. 60, 71 (1940) ("those who seek an exemption from a tax must rest it on *13 more than a doubt or ambiguity"); United States Trust Co. v. Helvering,307 U.S. 57, 60 (1939) ("Exemptions from taxation do not rest upon implication."); Bank of Commerce v. Tennessee ex rel. Memphis,163 U.S. 416, 423 (1896) ("the claim for exemption must rest upon language in regard to which there can be no doubt as to its meaning, and * * * the exemption must be granted in terms too plain to be mistaken * * *"); Roemer v. Commissioner,716 F. 2d 693, 696 (9th Cir. 1983), revg. 79 T.C. 398 (1982) ([all] realized accessions to wealth are presumed to be taxable income, unless the taxpayer can demonstrate that an acquisition is specifically exempted from taxation."). The fact that section 61(a) specifically includes certain payments as "income" does not mean that all other payments not specifically included are therefore not "income". Rather, petitioners' lump-sum buyout payment is taxable as gross income unless Congress has enacted a specific exemption evidencing "clear congressional intent" to the contrary. Commissioner v. Glenshaw Glass Co., supra at 431. Petitioners contend that section *14 106 permits the exclusion from gross income of the lump-sum payment at issue. We disagree. Section 106 stated: "Gross income does not include contributions by the employer to accident or health plans for compensation (through insurance or otherwise) to his employees for personal injuries or sickness." This language is amplified by Section 1.106-1, Income Tax Regs., which states: Contributions by employer to accident and health plans. -- The gross income of an employee does not include contributions which his employer makes to an accident or health plan for compensation (through insurance or otherwise) to the employee for personal injuries or sickness incurred by him, his spouse, or his dependents, as defined in section 152. The employer may contribute to an accident or health plan either by paying the premium (or a portion of the premium) on a policy of accident or health insurance covering one or more of his employees, or by contributing to a separate trust or fund (including a fund referred to in section 105 (e)) which provides accident or health *15 benefits directly or through insurance to one or more of his employees. However, if such insurance policy, trust, or fund provides other benefits in addition to accident or health benefits, section 106 applies only to the portion of the employer's contribution which is allocable to accident or health benefits * * * [Emphasis added.] The foregoing regulation clearly states that contributions by employers to an accident or health plan for the purpose of providing coverage to employees, their spouses, and dependents, against personal injuries or sickness are not taxable to employees. The exclusion is applicable whether an employer's contribution is made through payment of insurance premiums or whether it is made through contributions to an independent trust or fund. The regulation permits exclusion of payments made directly by an employer to an accident or health plan or to an independent fund or trust. It does not permit exclusion of payments made by an employer directly to the employee. The meaning of section 106 was clearly stated by this Court in Laverty v. Commissioner,61 T.C. 160, 165 (1973), *16 affd. 523 F.2d 479 (9th Cir. 1975): Section 106 has no application to payments an employer makes directly to his employee . . . It deals only with the treatment of contributions by an employer to an accident or health plan for the benefit of his employees, either in the form of contributions to a separate fund or trust or by the payment of premiums on a policy of accident or health insurance. [Emphasis in original] Thus, section 106 does not apply to payments made directly by Kaiser to petitioners. Petitioners cite Revenue Ruling 57-33, 1957-1 C.B. 303; Revenue Ruling 61-146, 1961-2 C.B. 25; Revenue Ruling 75-241, 1975-1 C.B. 316; and Revenue Ruling 82-196, 1982-2 C.B. 53, in support of their argument to exclude the lump-sum payment from gross income under section 106(a). However, those revenue rulings are not applicable. Taken together, they conclude that direct payments by an employer to either an employee or retiree *17 are excludable from gross income under section 106(a) if the payments are verified reimbursements to the employee for health insurance, which payments were in satisfaction of a legal or contractual obligation. Where the employee was not obligated to purchase the benefits, the exclusion was not available. These facts do not exist in the instant case. Consequently, the rulings do not support petitioners' argument for exclusion. The facts and issues of the case at bar are very similar to a recent decision of a District Court. In Adkins v. United States,693 F. Supp 574 (N.D. Ohio 1988), the plaintiffs were retirees and surviving spouses of retirees of Crucible Steel Corporation. A lawsuit was instituted by the retirees and surviving spouses against Crucible to prevent the corporation from terminating its contributions to a health plan under which the plaintiffs received benefits. Pursuant to a settlement offer by Crucible, the plaintiffs elected to receive lump-sum buyout payments from the corporation in full settlement of any claims they had or may have had against Crucible for future health benefits. As in this case, the issue was whether the lump-sum payments *18 received by the plaintiffs were excludable from gross income under section 106. In holding for the government, the District Court concluded: The facts of this case do not permit the plaintiff to rely on section 106. Section 106 clearly applies to contributions made by the employer to hospital, medical and accident benefit insurance programs, trusts, or funds. Section 106 does not contemplate, nor infer, direct payments to the employees. The plaintiffs have failed on their burden to establish that payments made directly to the plaintiffs are excludable under section 106. [693 F. Supp. at 577.] Petitioners also contend that the conversion of their right to tax exempt medical insurance into a lump-sum cash payment should be treated as an "involuntary conversion" under section 1033(a). [6] Petitioners believe Kaiser's precarious financial condition at the time of the lump-sum buyout offer forced them to take the cash payment. It appears that petitioners preferred to accept the cash payment in 1985 rather than face the possibility of receiving nothing in the future if Kaiser *19 declared bankruptcy. Section 1033 provides that, under certain circumstances, gains realized from an involuntary conversion are not to be recognized. However, section 1033 is only applicable where property is "compulsorily or involuntarily converted." Section 1.1033(a)-1(a), Income Tax Regs. This language indicates that section 1033(a) applies where the taxpayer has no alternatives but to surrender his property. This was not the case with petitioners. Petitioners were never forced to accept the lump-sum payment. Petitioners had the option of either taking the payment, participating in the Program of Continuing Coverage, or contesting Kaiser's threatened discontinuance of the 1980 Insurance Agreement. Therefore, since petitioners had alternatives available to them and were not forced to surrender their *20 benefits under the Health and Insurance Plan in exchange for the lump-sum payment, section 1033(a) is inapplicable. The regulation further states that "An 'involuntary conversion' may be the result of the destruction of property in whole or in part, the theft of property, the seizure of property, the requisition or condemnation of property, or the threat or imminence of requisition or condemnation of property." Section 1.1033(a)-1(a), Income Tax Regs. None of the foregoing categories are applicable to the case at bar. Petitioners' loss of the benefits under the Health and Insurance Plan was not a result of the destruction, theft, seizure, requisition, or condemnation of property. As such, petitioners were not subject to an involuntary conversion under section 1033(a). Petitioners recognize that they are asking this Court to expand the traditional application of section 106 to include the lump-sum payment at issue. Petitioners argue that Congress intended to provide relief to individuals in petitioners' situation. However, a review of the legislative history *21 of section 106 offers no tangible evidence to support this assertion. See H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 15, A35 (1954); S. Rept. No. 1662, 83d Cong., 2d Sess., pp. 185-186 (1954). Congress is at liberty to expand the exclusion under section 106 if it so chooses, but the current language of section 106 and the regulations promulgated thereunder fail to provide an indication that the lump-sum payment at issue is excluded from gross income. Absent such concrete and explicit authority, we must find the lump-sum payment includable in gross income. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. This matter has been selected as a test case. The parties in several cases have entered into stipulations to be bound by this case.↩
3. Hereinafter, "all eligible retirees, surviving spouses, and their eligible dependents" under the Kaiser Health and Insurance Plan shall be referred to as "eligible individuals."↩
4. We presume that petitioner-husband was an eligible individual.↩
5. In the stipulation of facts, the parties agree that petitioners set aside the $ 18,000 received by them for purchasing health insurance. They also stipulated that Kaiser withheld the Federal income tax and the stipulated exhibits reflect the withheld state income tax. We interpret these conflicting statements to mean that the net was set aside for said purposes.↩
6. In asserting that the lump-sum payment constitutes an involuntary conversion, petitioners never specifically cite section 1033(a). However, it is evident that petitioners were referring to section 1033(a)↩ based upon the nature of their argument.