OSCAR J. HINES AND VIRGINIA A. HINES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8413-77.    Filed July 30, 1979.

*James H. Rice*, for the petitioners.
*Robyn R. Jones*, for the respondent.

### OPINION

DAWSON, *Judge:* Respondent determined a deficiency of $10,891.63 in petitioners' income tax for 1975. Due to a concession by respondent, the only issue for decision is whether certain payments received by petitioner Oscar Hines may be excluded from petitioners' gross income pursuant to section 105(c).[1]

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and joint exhibits are incorporated herein by this reference. The pertinent facts are summarized below.

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated.

Oscar J. (hereinafter petitioner) and Virginia A. Hines were residents of Norman, Okla., when they filed their petition in this case.[2] Petitioner Oscar Hines was employed as an airline transport pilot by Pan American World Airways, Inc. (hereinafter Pan Am). On October 22, 1973, petitioner was admitted to the intensive care unit of Kaiser Medical Center, Vallejo, Calif., with chest pain. Petitioner's illness was diagnosed as a posterolateral or inferolateral infarction, or heart attack, and he remained in the hospital until November 2, 1973. He did not return to service after his release and was retired on medical grounds from pilot service with Pan Am on July 13, 1974.

Petitioner made an excellent recovery and by December 1974 he was running 2 miles a day, 5 days a week. Although a portion of his heart muscle tissue was destroyed and replaced by scar tissue, the heart continued to function normally. The loss of the destroyed muscle tissue was compensated to some degree by an increase in the productivity of the undamaged portion of the heart.

On September 19, 1974, petitioner's physician sent a letter to the Federal Aviation Administration (FAA) concerning petitioner's physical condition. In the letter, the physician stated that petitioner was "a good candidate to return to work as a pilot. * * * It is my recommendation that every consideration be given to reinstitute his pilot capacity for the airlines." However, both Pan Am's and the FAA's regulations permanently disqualify an individual for the position of pilot if he has a history of heart attack, irrespective of the degree of recovery and subsequent freedom from symptoms. Thus, petitioner was forever barred from resuming his occupation as an airline pilot.

Petitioner's loss of his pilot's license made him eligible for payments under Pan Am's Loss of License Plan for Pilots (hereinafter the plan). To qualify for benefits under the plan, a pilot member must be incapacitated for 14 continuous months. A pilot member of the plan is incapacitated if he has a physical or mental disability or condition such that he is unable to hold an FAA medical certificate needed to serve in the capacity and status in which he was serving at the time of incapacity. Once a pilot member qualifies he receives loss of license benefits for 46

---

[2]Virginia A. Hines is a party to this litigation solely by virtue of her having filed a joint return with her husband.

months unless one of the following events occurs: (1) Termination of incapacity; (2) attainment of normal retirement date; or (3) death. The plan provides monthly benefits for a maximum period of 46 months, exclusive of the initial 14-month qualifying period during which no benefits are received. The plan further provides for an alternative lump-sum benefit at the end of 10 months which can be elected by pilot members who have been permanently incapacitated.

The amount of the benefits a pilot member receives each year depends on the number of members who have become incapacitated during the 12 consecutive months preceding July 1 of each year and can reasonably be expected to receive benefits. All pilot members who are incapacitated and receive benefits in a 12-month period beginning July 1 and ending June 30 of the following year receive the same amount of benefits, no matter what physical or mental condition caused the incapacity.

The Loss of License Committee which administers the plan determined that petitioner was incapacitated for the requisite 14-month qualifying period and entitled to benefits beginning in January 1975. From January through October 1975, petitioner received benefits of $855.94 per month. In October 1975, petitioner elected to receive an optional lump-sum payment of $28,789.68 in lieu of the remaining monthly payments. Thus, petitioner received a total of $37,349.08 in loss of license benefits during 1975. Petitioners did not report this amount as income on their 1975 income tax return.

Section 105(a) provides that any amounts received by an employee under accident and health plans funded by the employer are included in the employee's gross income. Section 105(c), however, provides an exception to this general rule:

PAYMENTS UNRELATED TO ABSENCE FROM WORK.—Gross income does not include amounts referred to in subsection (a) to the extent such amounts—
    (1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and
    (2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

The parties agree that, if petitioner cannot qualify for the section 105(c) exception, the payments under the plan must be included in his gross income.

Respondent contends that the payments received by petitioner

do not satisfy either of the conditions imposed by section 105(c). First, he argues that the damage to petitioner's heart does not constitute a permanent loss or loss of use of a member or function of the body because the heart is functioning normally and petitioner is fully recovered. Second, he argues that the payments were computed with reference to the number of months petitioner was absent from work rather than the nature of the injury he suffered.

Petitioners, on the other hand, contend that the damage to the heart does satisfy section 105(c)(1) since a portion of the tissue was destroyed and its function permanently lost. Although petitioner is fully recovered, they argue he is now much more likely to suffer a disabling heart attack than a person his age with no history of heart trouble. Petitioners also maintain that section 105(c)(2) is satisfied because the same benefits would have been received even if Mr. Hines had come back to work for Pan Am in some capacity other than as a pilot. We agree with respondent that the payments do not satisfy either requirement of section 105(c).

A careful reading of section 105(c) leads us to conclude that the damage to petitioner's heart is not the type of injury which the statute was intended to favor. Injuries encompassed by the statute can be broken down into three categories: (1) The permanent loss or loss of use of a member of the body; (2) the permanent loss or loss of use of a function of the body; and (3) permanent disfigurement. The third category is clearly not applicable here because it refers only to external bodily appearance. Injuries included in the first two categories are described in section 1.105–3, Income Tax Regs., which provides in pertinent part:

For purposes of section 105(c), loss or loss of use of a member or function of the body includes the loss or loss of use of an appendage of the body, the loss of an eye, the loss of substantially all of the vision of an eye, and the loss of substantially all of the hearing in one or both ears. * * *

Although the use of the word "includes" in the regulation means that injuries covered by the statute are not necessarily limited to the examples given, we think the examples properly reflect the intent behind the statute. That intent was to provide a tax benefit to one who receives a severe physical injury which permanently and significantly lessens the quality of life which

he had enjoyed prior to the injury. Nothing in the legislative history of section 105(c) suggests a contrary interpretation.[3]

We do not think that the loss of the use of a portion of the muscle tissue of the heart constitutes the loss of a member or of a bodily function. We think that term "member" was intended to cover the loss of extremities such as arms, legs, or fingers. Thus, if damage to the heart tissue is to qualify under section 105(c)(1) it must be equivalent to the loss of a bodily function. Although in a technical sense the function of a particular portion of heart tissue has been lost, such a literal interpretation would circumvent the purpose of the statute. The "function" which must be the focus of our attention is that of the heart as a circulatory organ, and petitioner's heart is now functioning normally in that respect. We certainly do not minimize the seriousness of the heart attack petitioner suffered or the unpleasant period of convalescense which followed. Moreover, it is true that petitioner is now more likely to suffer another heart attack because the other muscles of the heart have been forced to increase their productivity to compensate for the damaged tissue. The fact remains, however, that petitioner is now leading a normal life and he may well live out a normal life span in spite of that increased risk.

Petitioner contends that respondent's position in the present case is at odds with the position taken in Rev. Rul. 63-181, 1963-2 C.B. 74. In that ruling, respondent determined that a victim of terminal cancer who had 2 months to live and was totally and permanently disabled could exclude disability payments under section 105(c). That situation is clearly distinguishable from the present case, however, because the cancer had permanently deprived the person of a bodily function.[4]

Petitioner places great emphasis on the fact that the heart attack permanently incapacitated him with respect to his job as a pilot. He seems to suggest that payment for any injury which permanently robs an individual of his principal means of

---

[3]In this regard, we note that the original House version of the statute had stated broadly that payments compensating for "injury or sickness" would be excluded from gross income. The Senate, however, changed the legislation to spell out "the precise conditions under which benefits paid as compensation for permanent injury or permanent loss of bodily function will be exempt," evidencing an intent to strictly limit the type of injuries covered by the statute. S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 185 (1954).

[4]The ruling does not state exactly how the taxpayer was disabled, but any number of infirmities could have satisfied the statute, such as a permanent loss of the ability to walk or to eat solid food.

livelihood should qualify for the section 105(c) exclusion. We cannot accept that proposition. We think that the overall scheme of section 105(c) is aimed at providing tax relief to persons who suffer serious, permanent physical injury and receive compensation because of it. The fact that a person may have also lost wages or suffered a diminution of earning capacity because of the injury is irrelevant. To deal with those concerns, Congress enacted section 105(d) which then provided a limited exclusion for amounts received while an employee was absent from work on account of personal injuries or sickness.[5] Section 105(c), however, states specifically that it does not apply to payments determined with reference to the period an employee is absent from work. Moreover, the exclusion it provides is also available for payments received by the taxpayer on account of permanent injuries suffered by his spouse or dependents, again without regard to whether the injuries interfere with their productive capacity. Thus, we conclude that the termination of petitioner's career as a pilot is of no consequence in determining whether his injury is covered by section 105(c).

Accordingly, we hold that the injury to petitioner's heart does not constitute the permanent loss of or loss of use of a member or bodily function under section 105(c)(1).

The payments at issue also fail to satisfy the second condition of section 105(c), which sets forth essentially two separate tests which the payments must satisfy: (1) The payments must be computed with regard to the nature of the injury, and (2) the payments must not be computed with regard to the period the employee is absent from work. See *Laverty v. Commissioner*, 61 T.C. 160, 167 (1973). In the present case, the payments clearly fail the first test. Under the plan, pilots become eligible for payments only when they become incapacitated. A pilot is deemed to be incapacitated when he has a physical or mental condition such that a pilot is unable to hold a FAA medical certificate. The benefits, however, do not vary according to the type of injury received and a pilot who has a heart attack is entitled to the same benefits as one who suffers a mental breakdown or loses a limb. Thus, the payments are not computed with reference to the nature of the injury.

---

[5]Under the provisions of sec. 105(d) petitioners are entitled to exclude $5,200 of payments received from the Pan Am Cooperative Retirement Income Trust Plan for Pilots. These benefits are unrelated to those provided under the Loss of License Plan.

Since the payments do not satisfy either section 105(c)(1) or the first test of section 105(c)(2), we think it unnecessary to decide whether the payments are computed with regard to the period petitioner was absent from work.

Accordingly, we hold that the payments at issue do not satisfy either section 105(c)(1) or section 105(c)(2) and must be included in petitioners' gross income.

To reflect the foregoing and a concession by respondent,

*Decision will be entered under Rule 155.*