**Frank S. WATTS and Barbara M. Watts, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 82–5315.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1982.

Decided Jan. 27, 1983.

---

---

Jonathan S. Cohen, Jo-Ann Horn, San Diego, Cal., Glenn L. Archer, Jr., Michael L. Paup, Washington, D.C., for defendant-appellee.

David E. Lundin, Fredman, Silverberg & Lewis, San Diego, Cal., for plaintiffs-appellants.

Before CHAMBERS, Senior Circuit Judge, ROBB,* Senior Circuit Judge, and ALARCON, Circuit Judge.

ALARCON, Circuit Judge.

Frank S. Watts and Barbara M. Watts appeal from the judgment of the district court granting the United States' cross-motion for summary judgment and dismissing with prejudice the Watts' claim for a refund of federal income taxes. The Watts seek a tax refund for the years of 1976, 1977, and 1978, contending that section 105(c) of the Internal Revenue Code, 26 U.S.C. § 105(c), allows the disability payments received by Frank Watts (Watts) in these years to be exempt from taxation.

The dispositive issue on appeal is whether the evidence presented by Watts demonstrates that these disability payments constitute payment for a "permanent loss or loss of use of a member or function of the body." 26 U.S.C. § 105(c).[1] We hold that the evidence does not show such a loss; consequently, the district court correctly determined that these payments were not excludable from Watts' gross income.

---

* Hon. Roger Robb, Senior United States Circuit Judge, District of Columbia, sitting by designation.

## I. STANDARD OF REVIEW

In reviewing the order granting the government's cross-motion for summary judgment, we apply the same standard applicable to the district court. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 n. 6 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Summary judgment shall be granted only when the record shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir.1972) (quoting *McGuire v. Columbia Broadcasting System, Inc.,* 399 F.2d 902, 905 (9th Cir.1968)).

Watts argues that his motion for summary judgment should have been granted and the government's cross-motion for summary judgment should have been denied because the government failed to present evidence establishing a triable issue of fact as to the applicability of section 105(c). We disagree.

A summary judgment is neither a method of avoiding the necessity for proving one's case nor a clever procedural gambit whereby a claimant can shift to an adversary the burden of proof on one or more issues. *United States v. Dibble,* 429 F.2d 598, 601 (9th Cir.1970) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969)). To obtain a summary judgment in favor of a claim, "the moving party must offer evidence sufficient to support a finding upon every element of his [or her] claim . . ., except those elements admitted . . ." by the adversary. *Id.* at 601. A plaintiff who seeks summary judgment and who fails to produce sufficient evidence on one or more essential elements of the claim is "no more entitled to a judgment . . . than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the plaintiff] bears the burden of proof." *Id.* In either situation, there is a failure of proof.

---

1. The Watts concede that 26 U.S.C. § 105(d) is inapplicable. We therefore do not discuss this section.

With these principles in mind, we turn first to an examination of the evidentiary materials presented by Watts in support of his claim for a tax refund pursuant to section 105(c). We also note that Watts, as a taxpayer in a refund suit, has the burden to prove overpayment of tax. *Martinez v. United States,* 669 F.2d 568, 569 (9th Cir.1981) (citing *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932)).

## II. *FACTS*

In support of his motion for summary judgment, Watts submitted his own affidavit and that of his physician, Dr. John C. Carlson. Watts also presented the affidavit of George S. Gentry, a member of the board of directors of the La Jolla Venture Inc. and of the Administrative Committee (the Committee) of the La Jolla Profit Sharing and Retirement Plan and Trust Agreement (the Plan). The government did not proffer any affidavits in its cross-motion for summary judgment; thus, the facts are not disputed.

Watts asserts in his affidavit that, during an annual medical examination in 1970, he was diagnosed as suffering from hypertensive vascular disease.[2] In June 1975, Dr. Carlson informed Watts that his hypertension "was *beginning* to seriously impair [his] health."[3] On June 30, 1975, following Dr. Carlson's advice, Watts obtained a four-month leave of absence. He also tendered his resignation from the Board of Directors of the Plan.

In December 1975, Watts submitted to the Committee a letter from Dr. Carlson. In this letter,[4] Dr. Carlson informed the Committee that his "examination of November 26, 1975 showed poorly controlled hypertension" and that he had "advised Mr. Watts that it was unwise for him to continue in a position of stress because of poorly controlled hypertension."[5] Dr. Carlson considered Watts "to be permanently disabled," and he recommended that Watts' employment "be terminated."[6] The Committee subsequently found Watts to be permanently disabled as defined by the Plan, and Watts received annual disability payments of $14,709 in 1976, 1977, and 1978.

In his September 14, 1975 affidavit,[7] Dr. Carlson set forth the basis for his conclusion

---

2. In his affidavit, Dr. Carlson defines this medical condition as high blood pressure and he notes that hypertension is usually asymptomatic. Exhibit ¶¶ 2, 4, plaintiffs' motion for summary judgment.

3. Exhibit A, ¶ 4, plaintiffs' motion for summary judgment (emphasis added).

4. Dr. Carlson's letter also is incorporated by reference in his affidavit. It states:
   I have been the personal physician for Frank S. Watts since 1–10–72.
   Mr. Watts has had hypertensive vascular disease since February 1970.
   Mr [sic] examination of 11–26–75 showed poorly controlled hypertension and I advised Mr. Watts that it was unwise for him to continue in a position of stress because of poorly controlled hypertension.
   I consider him to be permanently disabled and recommend that his employment with La Jolla Venture Incorporated be terminated.

5. Exhibit C, ¶ 4, plaintiffs' motion for summary judgment.

6. *Id.*

7. *Id.* the affidavit states:
   I, John C. Carlson, declare:
   If called upon to testify as a witness in this action, I could and would testify as to the existence of the facts set forth in the following paragraphs.
   1. I am a physician duly licensed to practice medicine in California since 1960, and have been treating Frank S. Watts since 1972.
   2. In 1972 I examined Mr. Watts and diagnosed him as having hypertensive vascular disease (commonly known as hypertension or high blood pressure). In June, 1975 the hypertension had become more severe. It was then and is now my professional opinion that such severe hypertension, coupled with the daily job-related stress suffered throughout the years leading up to June, 1975, would seriously impair Mr. Watts' health. In June, 1975, I accordingly recommended that Mr. Watts immediately seek a leave of absence from his employment.
   3. In November, 1975 Mr. Watts' hypertension had become yet more severe, and I consequently recommended that he retire because of the debilitating effect his hypertension would cause if he were to continue to work. In connection with this recommendation I prepared a letter dated December 11, 1975 for presentation to his employer's retirement plan committee. A true and correct copy of that letter is attached hereto,

that Watts was permanently disabled in 1975. In June 1975, Dr. Carlson determined that Watts' hypertension had become "more severe."[8] In Dr. Carlson's opinion, such severe hypertension, "Coupled with the daily job-related stress throughout the years leading up to June 1975, *would* seriously impair Mr. Watts' health."[9] He "accordingly recommended that Mr. Watts immediately seek a leave of absence from his employment."[10]

In November 1975, Watts' hypertension "had become more severe,"[11] Dr. Carlson recommended that Watts retire "because of the debilitating effect his hypertension *would* cause if he were to continue to work."[12] Although "[h]ypertension itself is asymptomatic," if it is "not controlled [it] *can lead* to heart attack, kidney disease, stroke, or death."[13] If Watts had continued his employment instead of retiring in 1975, "his hypertension *very likely would have lead* to death or one or more of the complications just named."[14] In Dr. Carlson's opinion, Watts' hypertension "effectively caused a loss of ability to function in the business setting in which he was employed in 1975, or in any other similar business setting involving the making and implementing of executive decisions."[15]

## III. *ANALYSIS*

Section 105(a)[16] sets forth the general rule for taxability of benefits received under accident and health insurance plans. The statute provides that such benefits shall be included in gross income to the extent that such payments are: (1) attributable to contributions by the employer which were not includable in the gross income of the employee; or (2) are paid by the employer. Section 105(c) provides an exemption to this rule for "[p]ayments unrelated to absence from work."[17] It provides that gross income does not include amounts referred to in subsection 105(a) to the extent that such amounts "(1) constitute payment for the *permanent loss* or *loss of use of a member or function of the body,* or the permanent disfigurement of the taxpayer ...," and (2) are computed with reference to the nature of the injury without

---

marked as Exhibit A, and is incorporated herein by this reference.

4. Hypertension itself is usually asymptomatic, but if not controlled can lead to heart attack, kidney disease, stroke or death. If, instead of retiring in 1975, Mr. Watts had continued as an employee of his employer, La Jolla Venture, Inc., his hypertension very likely would have led to death or to one or more of the complications just named. It is my opinion that Mr. Watts' hypertension effectively caused a loss of ability to function in the business setting in which he was employed in 1975 or in any other similar business setting involving the making and implementing of executive decisions.

**8.** Exhibit C, ¶ 1, plaintiffs' motion for summary judgment.

**9.** *Id.* at ¶ 2 (emphasis added).

**10.** *Id.*

**11.** *Id.* at ¶ 3.

**12.** *Id.* (emphasis added).

**13.** *Id.* at ¶ 4 (emphasis added).

**14.** *Id.* (emphasis added).

**15.** *Id.*

**16.** 26 U.S.C. § 105(a) provides in pertinent part:

§ 105. Amounts received under accident and health plans.

(a) Amounts attributable to employer contributions.—Except as otherwise provided in this section, amounts received by an employee through accident health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer.

**17.** 26 U.S.C. § 105(c) provides in pertinent part:

(c) Payments unrelated to absence from work.—Gross income does not include amounts referred to in subsection (a) to the extent such amounts—

(1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and

(2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

regard to the period the employee is absent from work." [18]

We need not determine whether the disability payments at issue here meet the second requirement of section 105(c), because we conclude that the evidence presented by Watts fails to demonstrate that the disability benefits constitute payment for a permanent loss of a body function. Even if we assume that the factual averments contained in the affidavits are true, they are insufficient to establish a *prima facie* claim for a tax refund under section 105(c). 26 U.S.C. § 105(c).

A. *Permanent Loss or Loss of Use of a ... Function of the Body.*

Neither the statute nor the legislative history sets forth the precise injuries or conditions that constitute permanent loss of a "function of the body." The Senate Report of the Committee on Finance notes that "[t]he House bill had merely indicated that payments compensating for injury or sickness shall be exempt[,]" while the Senate Committee's revision to the house bill "spells out the precise conditions under which benefits paid as compensation for permanent injury or permanent loss of bodily function will be exempt." S.Rep. No. 1622, 83d Cong., 2nd Sess. 185 (1954), U.S. Code Cong. & Admin.News 1954, pp. 4017, 4819. The Senate Committee's revision "makes it clear that certain payments for injury if made without regard to the employee's absence from work are to be exempt [if they are] for the permanent loss (or loss of use) of a member, or function of the body or for permanent disfigurement." *Id.* at 186.

Section 1.105–3 of the Income Tax Regulations, Treas.Reg. § 1.105–3 (1954), illustrates examples of injuries covered by section 105(c). The regulation provides in part that:

> For purposes of section 105(c), loss or loss of use of a member or function of the body *includes* the loss or loss of use of an appendage of the body, the loss of an eye, the loss of substantially all of the vision of an eye, and the loss of substantially all of the hearing in one or both the ears.

*Id.* (Emphasis added).

A revenue ruling [19] by the Internal Revenue Service (IRS) provides another illustration of the application of section 105(c). The IRS has ruled that section 105(c) applies to disability payments received by a person suffering from terminal cancer. Rev.Rule 63–181, 1963–2 Cum.Bull. 74, 75–76. In holding that the payments were for the permanent loss or loss of use of a member or a function of the body, the IRS relied on the findings of competent medical authority. This expert found that the taxpayer had a life expectancy of only a few months because of an acute cancerous condition "which totally and permanently disabled him." *Id.* at 76. The IRS noted that whether the section 105(c) exemption applies to payments received by an employee depends upon all the facts and circumstances in each case. *Id.* at 75.

Relying on this revenue ruling, Watts posits three arguments to support his view that section 105(c) applies to the disability payments at issue here. First, Watts contends that he has demonstrated a loss of bodily function because Dr. Carlson found him to be permanently disabled due to hypertension. Second, Watts claims that the evidence shows that he was found by competent medical authority to be "totally" as well as "permanently" disabled due to hy-

---

**18.** *Id.*

**19.** A revenue ruling, as distinguished from a regulation or administrative decision does not have the force and effect of law. *See Idaho Power Co. v. Commissioner,* 477 F.2d 688, 696 n. 10 (9th Cir.1973), *rev'd on other grounds,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974); *Merchants Industrial Bank v. Commissioner,* 475 F.2d 1063, 1064 (10th Cir.1973). Nevertheless, the rulings do constitute a body of experience and informed judgment to which courts may properly resort for guidance in the interpretation of relevant revenue statutes and regulations. *See St. Louis Bank for Cooperatives v. United States,* 624 F.2d 1041, 1050, 224 Ct.Cl. 289 (Ct.Cl., 1980); *Groves v. United States,* 533 F.2d 1376, 1380 (5th Cir.1976), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976).

pertension. Finally, in his reply brief, Watts insists the evidence shows that his hypertension caused the loss of a properly functioning cardiovascular system.[20] The government asserts that none of these arguments has merit. We agree.

### 1. *Permanent Disability—Loss of Work Function*

■ The Plan, under which Watts received disability payments, defines permanent disability as the "permanent incapacity of a Member to perform his [or her] assigned duties with the Company whether due to mental or physical disability, or both, without regard to the degree of incapacity of such member to perform other work."[21] Thus, qualification for disability benefits under the Plan depends on the individual's inability to perform in a particular assigned position.

Dr. Carlson's finding that Watts is permanently disabled focuses on this work-related definition. Watts' hypertension, in Dr. Carlson's opinion, "caused a loss of ability to function in the business setting in which he was employed in 1975 . . . [or any other similar business setting]."[22]

Both the Plan and Dr. Carlson define permanent disability in terms of the loss of a *work* function. Watts' evidence discloses only that he is entitled to disability payments under the Plan because he has permanently lost the capacity to work in a high-stress job involving executive decision making. Watts' *entitlement* to disability payments under the Plan, however, is not at issue.[23] Rather, the issue is whether Watts has shown that the disability payments were for the permanent loss of a body function. Watts' evidence that he has become permanently incapable of performing a work function does not meet the requirements of section 105(c) as *Hines v. Commissioner,* 72 T.C. 715, 719–720 (1979), upon which Watts relies, clearly demonstrates.

In *Hines,* the taxpayer, an airline pilot who had suffered a heart attack, argued that payment for any injury which permanently precluded an individual from performing his or her principal employment should qualify for exemption under section 105(c). The taxpayer had recovered medi-

**20.** Appellant's reply brief at 2.

**21.** Exhibit E at 7, section X(b), plaintiffs' motion for summary judgment.

**22.** Exhibit A ¶ 4, plaintiffs' motion for summary judgment.

**23.** Consequently, Watts' reliance on *Wood v. United States,* 590 F.2d 321 (9th Cir.1979) is misplaced. There, the government argued that 85 percent of the payments received by a disabled taxpayer pursuant to his employer's profit sharing and trust plan was not exempt under section 105 because of "this portion represented taxpayer's earned share of profit under a [profit-sharing plan] and, as such, was taxable" under 26 U.S.C. § 401(a). *Id.* at 323. This court agreed that the company's plan, as a profit-sharing, qualified for tax treatment under § 401. The plan, however, had a dual purpose since it also served as an accident or health plan, and the earned profit shares remained subject to the condition that in case of permanent disability they would be used as disability compensation. Under such circumstances, the precise nature and taxable status of a payment remains uncertain until it is "actually made in an individual case[.]" *Id.* The payments at issue in *Wood* "took on the tax-free status of a payment under § 105(c) because [the taxpayer's] entitlement to payment came as a result of disability pursuant to the company's accident or health plan." *Id.* For this reason, the payments were " 'for' the permanent loss of a bodily function." *Id.*

The foregoing discussion demonstrates that *Woods* has no applicability to the issue before this court. *Woods* did not address whether the taxpayer had presented sufficient evidence of the loss of a body function. Moreover, unlike Watts, who was found to be permanently disabled, the taxpayer in *Woods* was "*totally* and permanently disabled." *Id.* at 322. (emphasis added). As discussed *infra* at 352–353, Watts did not present evidence that he was "totally" disabled.

Watts also relies on *Berner v. United States,* No. Civ. 79–1485 W.D. pa. (Apr. 27, 1981), an unpublished memorandum disposition. Rule 21(c) of the Rules of United States Court of Appeals for the Ninth Circuit provides that any unpublished disposition "shall not be regarded as precedent and shall not be cited to or by this court . . . , either in briefs, oral argument, opinions, memoranda, or orders, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel." Since none of these exceptions is applicable, *Berner* has no precedential value and should not have been cited to this court.

cally from the heart attack, but was barred by regulations of the airline and the Federal Aviation Act from resuming his occupation as an airline pilot. He consequently received loss-of-license benefits pursuant to an employer benefit plan. The tax court rejected Hines' contention that the inability to perform one's chosen career is tantamount to a loss of body function pursuant to section 105(c). The tax court reasoned that:

> The fact that a person may have also lost wages or suffered a diminution of earning capacity because of the injury is irrelevant. To deal with those concerns, Congress enacted section 105(d) which then provided a limited exclusion for amounts received while an employee was absent from work on account of personal injuries or sickness. Section 105(c), however, states specifically that it does not apply to payments determined with reference to the period an employee is absent from work. Moreover, the exclusion it provides is also available for payments received by the taxpayer on account of permanent injuries suffered by his spouse or dependents, again without regard to whether the injuries interfere with their productive capacity. Thus, we conclude that the termination of petitioner's career as a pilot is of no consequence in determining whether his injury is covered by section 105(c).

72 T.C. at 720. (footnote omitted).

We find this analysis persuasive.[24] We also note that, by definition, payment for the loss of a work function does not constitute payment for the loss of a body function. It is quite possible for one to lose the capacity to function in a particular work setting without one's body losing the capacity to function in some manner. The terms "work" and "body" simply are not synonymous—they have different definitions.[25]

## 2. Evidence of Loss of "Body Function"

■ Watts argues that he has presented sufficient evidence to establish that his disability payments were payments for the permanent loss of body function. Watts' evidentiary argument is twofold. First, he maintains that hypertension is, by definition, an infirmity of sufficient severity to constitute the loss of a use of a body function. He asserts that the uncontested facts show that hypertension, "if sufficiently severe," can constitute a permanent loss of a function of the body. Second, Watts argues that Dr. Carlson found him to be "totally" disabled and that his hypertension has caused the loss of a properly functioning cardiovascular system. We disagree.

*On this record,* we can neither hold that the condition of hypertension, by definition, constitutes a permanent loss of body function nor that Watts' hypertension is found in the letter and affidavit of Dr. Carlson. A review of this evidence demonstrates that Watts failed to establish a permanent loss of body function—an essential element of his tax refund claim pursuant to section 105(c).

In his December 11, 1975, letter to the Committee of the Plan, Dr. Carlson states that Watts' poorly controlled hypertension made "it unwise for him (Watts) to continue in a position of stress."[26] Dr. Carlson does not delineate any adverse symptoms or injury to Watts' bodily functions. Similarly, in his affidavit, Dr. Carlson asserts that Watts' severe hypertension, coupled with the past daily job-related stress, would severely impair Watts' health if he continued working. Thus, Dr. Carlson refers only to the debilitating effect Watts' hypertension *would* cause if he were to continue his work. Dr. Carlson never asserts what, if

---

**24.** We do not adopt the tax court's view that the intent of the statute "was to provide a tax benefit to one who receives a severe physical injury which permanently and *significantly lessens the quality of life which he had enjoyed prior to the injury.*" 72 T.C. at 718–19 (emphasis added). The statute does not address the loss of a quality of life previously enjoyed.

**25.** Work is defined as (1) "[e]ffort directed toward the production or accomplishment of something; toil; labor. (2) Employment . . .; while body means "the physical structure of an organism, . . ." The American Heritage Dictionary of the English Language 798, 80 (1976).

**26.** Exhibit A, plaintiffs' motion for summary judgment.

any, loss of body function Watts suffered as a result of his hypertension and retirement in terms of control and of preventative measures:

> Hypertension itself is usually asymptomatic, but *if not controlled can lead to heart attack, kidney disease, stroke or death. If instead of retiring in 1975,* Mr. Watts had continued as an employee of his employer, La Jolla Venture, Inc., *his hypertension very likely would have led to death or to one or more of the complications just named.*[27]

Watts, however, did not continue working. As the government notes, the only inference which can be drawn from these facts is that Watts, at the time of his retirement, had not yet developed any of the medical conditions to which Dr. Carlson refers.

Further, Dr. Carlson neither addresses what effect, if any, hypertension has on the cardiovascular system, nor what effect Watts' hypertension had on his cardiovascular system at the time of his retirement. The record here neither supports Watts' assertion that his hypertension caused a loss of a properly functioning cardiovascular system nor Watts' statement that Dr. Carlson found Watts "totally" disabled. Legal memorandum and argument are not evidence and cannot, by themselves, create a factual dispute sufficient to defeat summary judgment where no dispute otherwise exists. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951–52 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, Watts' own assertion that hypertension, if sufficiently severe, *may* constitute a loss of body function, belies a conclusion that hypertension always constitutes a loss of body function. Rather, the statement suggests that: (1) hypertension has varying degrees of severity; and (2) if hypertension is not sufficiently severe, then it does not constitute a loss of body function.

## IV  CONCLUSION

Watts simply failed to present evidence that his disability benefits were payments for the loss of a body function—an essential element of his section 105(c) tax refund claim. Accordingly, the district court correctly determined that the government was entitled to judgment as a matter of law. *Cf. Hutchinson v. United States,* 677 F.2d 1322, 1326 (9th Cir.1982) (summary judgment and dismissal of claim proper where pleadings and affidavits establish that petitioner had not satisfied the jurisdictional requirement of satisfying income tax liability prior to instituting action for refund); *Bushie,* 460 F.2d at 119 (summary judgment against plaintiff upheld where he failed to present evidence from which elements of his antitrust claim could be inferred; plaintiff could not prevail under his asserted version of the facts).

AFFIRMED.

---

**27.** Exhibit C, ¶ 4, plaintiffs' motion for summary judgment (emphasis added).