T.C. Memo. 2016-177

UNITED STATES TAX COURT

ESTATE OF HOWARD J. BARNHORST, II, DECEASED, MARNIE W.
BARNHORST, SUCCESSOR IN INTEREST AND MARNIE W. BARNHORST,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10754-14.          Filed September 20, 2016.

Mitchell Barry Dubick and Joshua P. Katz, for petitioner.

Monica D. Polo and Mistala M. Cullen, for respondent.

MEMORANDUM OPINION

HOLMES, Judge: Howard Barnhorst was diagnosed with cancer in 2009.

He filed a claim for payment from a policy that he'd set up years before. The

policy paid him more than $1 million. He died in 2014, and his estate says this

payment was from a health or accident plan for the bodily damage, disfigurement,

[*2] or loss inflicted on him by cancer. The Commissioner says the distribution was deferred compensation. There are no factual disputes, and the parties have filed cross-motions for summary judgment.

Background

Howard Barnhorst was born in October 1948, and had a life well lived. He became a lawyer, and his success in law was coupled with success in marriage to Marnie Barnhorst. She was also a highly regarded lawyer, and they were wed for 44 years and reared four children. Howard worked for much of his career at the law firm of Seltzer, Caplan, McMahon, and Vitek until he decided to hang a shingle of his own. That firm became Barnhorst, Schreiner & Goonan, Inc. (BSG), and Howard devoted his time as an attorney to BSG through 2000. After leaving BSG in 2001, Howard returned to Seltzer.

Early in his career, Howard met another attorney, Ernest Ryder. Ryder specializes in tax planning and retirement benefits and was United States counsel for American Specialty Insurance Group, Ltd. (American Specialty), a company organized under the laws of the Turks and Caicos Islands. BSG hired Ryder to write a policy to insure Howard. The policy was called Policy Number 1994-004. Ryder opened a Charles Schwab account under the name American Specialty Insurance Group, Ltd. Policy No. 1994-004 and had signature authority over it.

[*3] He also billed BSG for policy fees. It is this unusual feature--an insurance policy with its own brokerage account--that the reader should focus on, because neither the IRS nor the Court has ever seen the policy itself.

We do have in the record the policy that is central to this case, Policy No. 1999-001. Ryder also drafted this policy, and it was issued by American Specialty in 1999. The policy's title was "Disability Income Insurance Policy," and it listed Howard as the insured and BSG as the employer and policyholder. It states that American Specialty has never been authorized to do business by any insurance commissioner of any state in the United States and that it doesn't transact any insurance business in the United States. It asserts instead that it is governed by Turks and Caicos law.

The policy provided benefits to Howard if he became totally or partially disabled. It defined "total disability" as Howard's inability to "perform the substantial and material duties of his regular occupation" that was caused by "accident, sickness, injury, or physical, mental or emotional condition." The policy defined "partial disability" as the ability to do some, but not all, of Howard's substantial and material duties in his regular occupation if as a result his pay was at least 20% less than he otherwise would have received at full working capacity. In the event of total disability, Howard could claim a fixed monthly

[*4] disability-income benefit originally set at $5,612.92 a month but which was updated on an annual basis. These payments would last for 150 months or until Howard died. In the event of partial disability, Howard could claim the same monthly benefit, less 50% of his annual earnings from BSG. The policy also defined a third type of disability: "catastrophic disability." The policy defined this type of disability as total disability that was caused by a specific injury or sickness. In the event of a catastrophic disability, Howard could claim a lump-sum benefit.

The policy listed many kinds of catastrophic disabilities with apparently different payouts. The loss of an eye, hand, foot, arm, or leg; permanent brain damage; or permanent loss of hearing in both ears entitled Howard to the lesser of 97% of the cash value of the policy or 10 times his highest annual earnings for any fiscal year of BSG. The loss of the use of any internal body organ, including any heart or kidney dysfunction, or the permanent loss of hearing in only one ear, entitled him to the lesser of 97% of the cash value of the policy or eight times his highest annual earnings from BSG. Permanent disfigurement of the body or skin caused by external or internal bodily injury, damage or disease, entitled him to 97% of the cash value or six times earnings. And finally, if total disability resulted from "any other condition which qualifies for the exclusion under Section

**[\*5]** 105(c) of the Internal Revenue Code," Howard would be entitled to the lesser of 97% of the cash value or four times earnings.[1]

These different categories of catastrophic injuries would seem to trigger different payouts (depending on the value of the policy and what he was making at BSG)--except for one important clause. Provision 2.4(e) stated that "to the extent 97% of the cash value of the policy exceeds [Howard's] catastrophic disability benefit as based on a multiple of [Howard's] highest annual earnings * * * such excess shall be divided by the number of months in the maximum benefit period, and the resulting amount shall thereupon become the monthly disability income benefit." In other words, if Howard didn't get the full 97% cash value from a lump-sum payment from any type of catastrophic injury, he'd get the rest of it in monthly installments over the course of the benefit period, regardless of the type of "catastrophic disability" he suffered.

To get these benefits, the policy said Howard had to file a claim with American Specialty. If Howard were to die while the policy was in effect, American Specialty would pay 97% of the cash value to Howard's designated beneficiaries. The policy would automatically renew each year if BSG paid the

---

[1] The 97% was changed to 98% throughout all the clauses of the policy in the 2004 policy renewal and then remained at 98%.

[*6] required premium. The premiums would go to a segregated account that Ryder maintained. Ryder invested the premiums in a diversified portfolio of mutual stock and bond funds where they could build value over the years until benefits had to be paid. This segregated account turned out to be the one titled for Policy 1994-004, the policy that never made it into the record. The initial premium on the policy that is at issue was $701,614.57, with additional premiums of $100,000 in 2001 and $170,000 in 2003. There were no premiums in any other year of the policy, though the potential monthly benefit was updated with each renewal rider. Howard was also able to borrow from the account to finance his home, which he did several times and in amounts that sometimes exceeded $100,000. Howard would occasionally pay back the loans, but he also deducted the interest he paid on them as mortgage interest for 2009.

The policy had another important clause: It would terminate upon the earliest of: (1) Howard's turning 60; (2) his death; or (3) his no longer being an employee of BSG. If the policy terminated for either the first or third reason, Howard had the right to convert the coverage into a life-insurance policy with a cash surrender value equal to 97% of the cash value of the disability policy on the date of termination. Termination for the second reason would result in an immediate payout of 97% of the cash value to Howard's beneficiaries. Howard

**[*7]** turned 60 in October 2008, thus presumably triggering a termination. But American Specialty continued to send renewal riders through a policy period ending February 1, 2010.

The policy became important to the Barnhorst family when Howard had cancer-related surgery. According to Marnie, because the cancer had spread beyond his prostate, the surgeon had to remove much more than that organ, which led to a permanent loss of several bodily functions. Howard fought the cancer as hard as he could, endured whatever treatment his doctors recommended, and traveled out of town and abroad for treatment. He also somehow managed to work at Seltzer throughout it all, recording more than 2,000 hours in both 2009 and 2010.

In March 2010, however, he filed a claim with American Specialty under the policy for a "catastrophic disability" benefit. Seven days later Ryder authorized a check to be drawn for nearly $500,000 from the American Specialty account. This is what was left after repaying the loans Howard had taken from the account. Ryder authorized this payout despite not reviewing any documentation

[*8] of Howard's medical condition. He also kept more than $30,000 from the account as his fee.[2]

Between 2010 and 2013 Howard's health continued to deteriorate. After a wrenching discussion with his wife and children, he decided against further heroic but futile treatments, and he died in April 2014. The Barnhorsts reported the entire amount received from American Specialty in 2010 (including the loan setoff and Ryder's fee) as nontaxable pension and annuities income on their return for that year. The IRS issued a notice of deficiency to them that determined the amount was taxable compensation. The Commissioner asserted in the notice of deficiency a section 6662(i)[3] penalty for transactions lacking economic substance, but later changed his mind and pleaded in his answer that he wanted only a 20% accuracy-related penalty under section 6662(a).

Marnie, a California resident, timely filed a petition for herself and as successor to Howard's interest. She moved for summary judgment, and the Commissioner answered and cross-moved.

---

[2] This amount represents around 3% of the account's value. It's unclear why Ryder didn't get only 2%, as the payouts were changed to 98% from 97% in 2003.

[3] All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*9]**                                     Discussion

We apply the usual rules of summary judgment. Rule 121(b); Sundstrand

Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir.

1994). Neither party here sees any dispute about any material fact, and we can

decide the motion on the law. Marnie Barnhorst argues that she and her late

husband got it right--the payments are nontaxable distributions. She argues that

the policy was an employer-funded accident or health plan under section 105(a)

and that their payment from it is excludable under subsection (c). The

Commissioner argues Howard was guaranteed to get the same 98% payout no

matter what happened, regardless of any medical conditions, which in his mind

makes the policy a deferred-compensation package masked as an accident or

health plan to avoid tax on over $1 million of income.

We see two substantive issues. First, is the policy an accident or health plan

as defined in section 105(a)? Second, if it is, were the payments from the policy

excludable from income under section 105(c) as payments not related to the

absence of work? There's also the issue of whether the Barnhorsts should be

liable for a section 6662(a) penalty, if we find for the Commissioner.

We'll address these in turn.

**[\*10]** I.     Is this an accident or health plan as defined in section 105?

The Code does not define the term "accident or health plan." The regulations do: "In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees." See sec. 1.105-5(a), Income Tax Regs. Questions often arise as to whether a plan is a deferred-compensation, or an accident-or-health plan, or perhaps both. See, e.g., Wellons v. Commissioner, 31 F.3d 569, 571-72 (7th Cir. 1994), aff'g T.C. Memo. 1992-704; Machacek v. Commissioner, T.C. Memo. 2016-55. Caselaw has sprouted, and we now look for:

- a statement in a written plan that its purpose is to qualify as an accident or health plan within the meaning of the Code and that the benefits are eligible for income tax exclusion;

- specification in a plan that the benefits payable are those amounts incurred for medical care in the event of personal injury or sickness;

- terms in a plan that the benefits payable are limited to legitimate medical expenses; and

- a provision allowing an employee to be compensated for specific injuries or illness, such as the loss of a limb.

[*11] Berman v. Commissioner, 925 F.2d 936, 939 (6th Cir. 1991), aff'g T.C. Memo. 1989-654; Estate of Hall v. Commissioner, T.C. Memo. 1996-93, 1999 WL 89625, aff'd without published opinion, 103 F.3d 112 (3d Cir. 1996).

The first factor is unquestionably met here, and both parties agree about that. Provision 5.18 of the policy specifically says "[t]his policy is intended to qualify as an accident and health plan within the meaning of Sections 104 and 105 of the Internal Revenue Code of the United States which [BSG] maintains for the benefit of [Howard]." Also, the catch-all catastrophic-disability provision provides benefits for "any other condition which qualified for the exclusion under Section 105(c) of the Internal Revenue Code." There can be no doubt that Ryder had section 105 in his mind when he drafted the policy.

The second and third factors--which are so similar that we'll treat them together--are a bit more complicated. Assuming the policy didn't terminate, Marnie is right that the only way Howard could get money out of the policy was if he sustained some kind of injury or illness. This is in stark contrast to a typical deferred-compensation plan that might involve some vesting and that could be paid out for non-health-related reasons. But payouts under this policy had no correlation with Howard's actual medical expenses--under its terms he would receive either a lump sum or a fixed monthly benefit. The amount of this payment

[*12] had nothing to do with his actual expenses. He would, for example, be entitled to the same amount if he lost hearing in one ear or the use of both his kidneys. Medical expenses for these two conditions would quite likely be different, but payout under the policy would be the same.

That's a crucial distinction. The cases tell us to ask whether a plan pays for actual medical expenses, not whether its payee suffers from some triggering condition. In Berman, the court said we look to see if the plan covers expenses "*incurred* for medical care."[4] 925 F.2d at 939 (emphasis added). Berman itself dealt with a plan that had a "triggering event" and found it to be only a deferred-compensation plan. Id. at 940. In Estate of Hall, we similarly concluded "that the disability provision in the * * * plan was merely one of several events that could trigger a participant's claim to accrued retirement benefits." 1996 WL 89625, at *5. In discussing these same factors, the Second Circuit in Caplin v. United

---

[4] We are mindful that this may seem inconsistent with Wood v. United States, 590 F.2d 321 (9th Cir. 1979). In Wood, the Ninth Circuit found that the payments were excludable under section 105(c). The plan at issue seemed somewhat like the one in Berman because it contained an all-or-nothing triggering event. But the issue of whether the plan was an accident or health plan was conceded by the government, so Wood is easily distinguishable. Id. at 323; see also Beisler v. Commissioner, 814 F.2d 1304, 1308 (9th Cir. 1987) (acknowledging that Wood never analyzed the question of whether the plan was an accident or health plan in the first place, but rather operated under the assumption it was), aff'g T.C. Memo. 1985-25; Gordon v. Commissioner, 88 T.C. 630, 637 (1987).

**[*13]** <u>States</u>, 718 F.2d 544, 549 (2d Cir. 1983), stated the plan "could also specify that the benefits payable *be limited to those amounts incurred for medical care* in the event of personal injury or sickness, and provide for *the specific reimbursement of such expenses*." (Emphasis added.)  The disability policy here distinguished between partial and total disability in its definitions, but once Howard suffered either condition, the payout to his family would be the same.  Therefore, we find this factor to favor the Commissioner.

The policy purports to distinguish between types of injuries and illnesses, thus seemingly meeting the final factor easily.  But the policy's distinctions don't make any real difference.  The policy, for example, seems to consider permanent brain injury more significant than the loss of hearing in one ear--one would get Howard up to 10 times his annual earnings, the other only 8--but Provision 2.4(e) ensures that for any type of catastrophic injury Howard would get the entire 98% cash value of the policy and nothing more.[5]  Admittedly, it was possible that the timing of the payments could differ, depending on Howard's highest annual

---

[5] We note that the inclusion of "partial" disabilities might seem to make the policy distinguish between injuries, but the distinction between partial and total disabilities the policy draws in vague language about Howard's ability to work is not very specific.  Also, because Howard left BSG and BSG later became defunct, the payment for a partial disability would be the same as a total disability, as discussed in more detail later.

**[\*14]** earnings from BSG and the value of the policy. But we don't believe this potential (and uncertain) difference in timing outweighs the fact that Howard would get the same money in the end.

Our skepticism is only whetted by some other sharp observations that the Commissioner makes. The Commissioner is certainly correct that the policy's terms say it terminates automatically when Howard turns 60 or is no longer an employee of BSG. Howard turned 60 in October 2008, about a year and a half *before* his claim. Marnie argues that even though this is true, the policy didn't really terminate because American Specialty kept sending riders to BSG to renew the policy each year. She asserts that this effectively created a pattern that BSG and Howard relied on and that it would be inequitable to find that the policy terminated according to its terms. She cites Golden Eagle Ins. Co. v. Foremost Ins. Co., 25 Cal. Rptr. 2d 242, 254 (Ct. App. 1993), where the court held the insurer had to honor a policy that should've terminated but for which the insurer issued automatic renewals and continued to collect premiums. This case is distinguishable for a couple reasons. First, the court in Golden Eagle based its decision on the adage that "he who takes the benefit must bear the burden." Id. at 252. American Specialty didn't charge any new premiums for this policy after 2003. It did collect a fee of 1% of the account value on a semiannual basis under a

**[*15]** provision of the agreement, so in that sense there was still a benefit for American Specialty to renew each year. But this fee resembles a charge to manage the account assets, not anything related to insuring a risk, thus easily distinguishing it from the premiums in Golden Eagle. Second, the record here contains only a renewal through February 1, 2010, and Howard made his claim on March 22, 2010.

The Commissioner also argues that Howard was no longer an employee of BSG when he made the claim. A number of cases have dealt with questions of whether a plan was for employees or shareholders, but it's clear a plan must be for "employees". See, e.g., Am. Foundry v. Commissioner, 536 F.2d 289 (9th Cir. 1976), aff'g in part, rev'g in part 59 T.C. 231 (1972); Smith v. Commissioner, T.C. Memo. 1970-243. Marnie argues that Howard was still a corporate officer of BSG in 2010 and that this means he was an employee by definition under the Code. See sec. 3121(d)(1). But section 3121(d)(1) defines employee to include corporate officers only for the purposes of employment taxes and does not control for section 105. And there is no dispute that Howard devoted his entire working time as a lawyer to Seltzer in 2009 and 2010. He remained a corporate officer of the by-then-all-but-defunct BSG, but Marnie also admitted that the company stopped

[*16] serving clients in 2003 and had had its corporate powers and privileges suspended by the California secretary of state.

We won't make the outcome of these motions turn on these facts, but they can't help but sway us in the Commissioner's direction because they too support his characterization of the policy as a disguised form of deferred compensation. We, however, need only figure out if the policy is an accident or health plan. It does lack some qualities of a typical deferred-compensation plan, namely, that Howard didn't have a vesting period for the benefits. And, even though payouts for the most part were conditioned on some sort of injury or illness, the policy did not provide for reimbursement of medical expenses; and its distinctions between types of disabilities were effectively meaningless (except maybe for a potential difference in the timing, if not the amount, of the payouts). Most important, Howard (or his beneficiaries in the event of death) was guaranteed to get the 98% cash value *no matter what happened*. If the policy terminated before he was disabled, he could convert it to a life-insurance policy with a cash surrender value equal to 98% of the value of the policy. This guaranteed payout is a very strong indicator that the policy was a form of deferred--and taxable--compensation.

We therefore find that the policy was not an accident or health plan under section 105(a).

**[\*17]** II.    <u>Are these payments excludable from income under section 105(c)?</u>

Even if it were, the Commissioner also wins on one of his alternative arguments. To be excludable from income, payments from an accident or medical plan must "constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent", and "*are computed with reference to the nature of the injury without regard to the period the employee is absent from work.*" Sec. 105(c)(1) and (2) (emphasis added). The first of these requirements is easily met by the policy at issue here. Although the statute doesn't explicitly define the terms "member", "function of the body", or "disfigurement", we have cases to guide us. Permanent disfigurement "refers only to external bodily appearance." <u>Hines v. Commissioner</u>, 72 T.C. 715, 718 (1979). The term "member" is "intended to cover the loss of extremities such as arms, legs, or fingers." <u>Id.</u> at 719. "Function" is broader, but seems to focus on internal body organs and their role. <u>Id.</u> The emphasis seems to be not on the organ itself but on the function it plays. Thus, when an airline pilot suffered a heart attack, this wasn't deemed to fall within the statute's exemptions because his circulatory system was fully functional, even though the heart was still damaged and the chances of future heart attacks increased. <u>Id.</u>

[*18] Howard had his prostate removed in 2009. The Commissioner argues that neither this loss, nor his cancer diagnosis, is enough to meet the conditions of section 105(c). Marnie agrees that a cancer diagnosis by itself isn't enough under section 105(c)(1), but disagrees that Howard didn't lose any bodily functions. On this point we have to agree with Marnie. According to her sworn statement, Howard lost more than just his prostate. His intestines were also affected, and he never again had normal sexual, bowel, or urinary functions. We hold that these amount to a loss of at least some bodily functions.

The Commissioner, however, also argues that the payments weren't calculated with reference to the nature of the injury and thus fail section 105(c)(2). Marnie counters that they were, but emphasizes that the payments weren't calculated with "regard to the period" Howard was absent from work. Marnie is both right and wrong. She is right that the payments were not calculated with regard to the time Howard was absent from work. The calculation of a given payment would be the same whether it happened the day after BSG signed the policy or ten years later, and it wouldn't change if Howard could return to work after six months or could never return again. Section 105(c) says, however, the payments *also* have to be "computed with reference to the nature of the injury," and these weren't.

**[\*19]** This is critical. "Computed" is not synonymous with "triggered". As the Ninth Circuit held in Beisler, "amounts received as accident or health insurance benefits may be excluded from gross income under section 105(c) *only if* paid by a plan that *varies the amount of payment according to the type and severity of the injury* suffered by the employee." 814 F.2d at 1308 (emphases added). When taxpayers argued before us that Beisler was wrong, and that section 105(c) requires only that the payment not be contingent on time missed from work due to injury or sickness, we ruled that "it is insufficient to satisfy the section 105(c) requirements for exclusion that payments are made without regard to absence from work and on account of injury or sickness. We agree with [Beisler] that [the taxpayers'] interpretation would make that nature-of-the-injury language superfluous." Kelter v. Commissioner, T.C. Memo. 1996-405, 1996 WL 495592, at \*6.

Marnie argues that the policy meets this variable-payment requirement because it did distinguish partial, total, and catastrophic injuries and because it also distinguished different types of catastrophic disabilities. But the policy did so only superficially. Provision 2.4(d) includes in its definition of "catastrophic disability" any totally disabling condition not included in provisions 2.4(a)-(c) that "qualifies for the exclusion under Section 105(c) of the Internal Revenue Code."

**[\*20]** So "catastrophic disability," which by definition was only a subset of "total disability," included all conditions that might qualify under section 105(c). This makes the sets of total and catastrophic disabilities identical.

Marnie still wants us to believe that catastrophic disabilities were further broken down into subcategories. See Kelter v. Commissioner, 1996 WL 495592, at \*5 (noting that to satisfy the requirements of section 105(c)(2), a "plan must provide [for] at least two levels of benefits, with the difference in entitlement at each level keyed to the nature (severity) of the injury compensated at that level"). We also agree the policy does distinguish between types of catastrophic injuries-- but the distinctions are meaningless because Provision 2.4(e) ensured that Howard would receive the same payout in the end.[6] By ensuring that Howard would

---

[6] We note that the timing difference could potentially cause a small difference in total payout between catastrophic injuries. If Howard suffered a disability that only qualified him for the lesser of 98% cash value of the policy or 4 times his highest annual earnings, and this resulted in a lower payment than one that paid out 10 times his highest annual earnings, the remaining cash left in the account (less Ryder's fee) would be paid out as a monthly disability benefit to Howard. As the cash remaining in the account continued to earn a return, it could prolong the monthly benefits and increase the total payout to Howard. We don't believe this to be of any practical significance. And provision 2.10 may make even this tiny distinction disappear. It states that "[n]otwithstanding anything herein to the contrary, benefits to which an Insured . . . is otherwise entitled hereunder may be payable under whichever of the following methods . . . as the Insured or his Beneficiary shall elect within 60 days after becoming entitled to the benefits hereunder: (a) A single lump sum distribution in cash."

**[*21]** receive the same amount of money regardless of the type of section 105(c)(1) illness or injury, we hold that this policy failed to satisfy section 105(c)(2)'s requirement that an accident or health plan compute the benefits with reference to the nature of the injury.

That still leaves the category of "partial disability" as perhaps distinct from "total disability" and "catastrophic disability." The policy defined "partial disability" as a disability that reduced his annual earnings but did not leave him unable to work as a lawyer. But the policy defined the benefit Howard would receive if partially disabled to be the same monthly benefit as total disabilities "reduced by 50% of the Annual Earnings the Insured receives while he is Partially Disabled." But then "Annual Earnings" is defined as the taxable compensation reported on his Form W-2, Wage and Tax Statement, from BSG, a defunct law firm. Without that offset, the payouts for partial disabilities become equal to those for total disabilities, thus clearly not meeting the requirement that the payments be made in reference to the nature of the injury.

We do not doubt that Howard's cancer and surgery might have qualified him for income exclusion under an accident or health plan that met all of the requirements of section 105(c). But that is irrelevant--we have to see if the policy by its terms qualifies. See Rosen v. United States, 829 F.2d 506, 509 (4th Cir.

**[*22]** 1987) ("[F]or payments to be excludible from income under section 105(c), the instrument or agreement under which the amounts are paid must itself provide specificity as to the permanent loss or injury suffered and the corresponding amount of payments to be provided. * * * The actual permanency of injury is not alone determinative of whether the amounts paid qualify for exclusion"); Estate of Hall v. Commissioner, T.C. Memo. 1996-93 (citing Rosen and holding the same).

III.    Accuracy-related penalty

The Commissioner affirmatively pleaded in his answer that an accuracy-related penalty under section 6662(a) applies.  This means he bears the burden of proof and not just the burden of production.  See Rule 142(a).  A 20% accuracy-related penalty applies if there's either (1) a substantial understatement of tax, or (2) negligence or disregard of rules and regulations.  Sec. 6662(b)(1) and (2).  The Commissioner alleged both.

An understatement of tax is substantial if it exceeds the greater of 10% of the amount of tax required to be shown on the return or $5,000.  Sec. 6662(d)(1).  Both are met here because the understatement is $346,239 of a tax due of $525,527.  A taxpayer can normally avoid summary judgment on the penalty only by showing some admissible evidence of reasonable cause and good faith.  Sec. 6664(c)(1).  Because the Commissioner has the burden of proof in this case, it's

[*23] his burden to show there wasn't reasonable cause.  See Sanderling, Inc. v. Commissioner, 66 T.C. 743, 757 (1976) ("However, if the additional tax is for the first time asserted in respondent's amended answer, it is considered a 'new matter' and the burden of showing an absence of reasonable cause falls upon respondent"), aff'd in part, 571 F.2d 174 (3d Cir. 1978).

The Commissioner asserts many reasons why Howard did not have reasonable cause.  He is quick to point out that Howard and Marnie both were experienced and accomplished attorneys, meaning they should've been more aware than most that this policy did not meet the requirements of the Code.  Second, and more important, he argues that if Howard placed any reliance on a professional, he placed it on Ryder.  Ryder was extensively involved in the policy, from drafting the documents to accepting payments made to American Specialty.  He also had a financial interest in the transaction in the form of biannual fees.  Therefore, Howard could not justifiably rely on someone who would personally profit.  See, e.g., Neonatology Assocs., P.A. v. Commissioner, 299 F.3d 221, 234 (3d Cir. 2002), aff'g 115 T.C. 43 (2000).  These are compelling reasons to us that Howard didn't have reasonable cause for the understatements.  Marnie asserted reasonable cause in her reply to the Commissioner's answer, but she presented no evidence in her answer to his summary-judgment motion.  Without giving us a

**[\*24]** reason to overlook the Commissioner's compelling reasons, we find that he met his burden, and we will sustain the penalty.

We therefore grant summary judgment to the Commissioner on the issues of the taxability of the disability-policy payments and the accuracy-related penalty. Because the Commissioner conceded the section 6662(i) penalty, we'll grant summary judgment to the Barnhorsts on that issue.

<u>An appropriate order and decision will be entered</u>.